IN THE COURT OF APPEALS
OF MARYLAND

Misc. Nos. 1, 2, 3 and 5
September Term, 2012

---

IN THE MATTER OF 2012

LEGISLATIVE DISTRICTING

OF THE STATE

---

Barbera, C.J.,
Harrell
Battaglia
Greene
Adkins
McDonald
*Bell,

JJ.

---

Opinion by Bell, C.J. (Retired)

---

Filed: December 10, 2013

*Bell, C.J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being
recalled pursuant to the Constitution, Article
IV, Section 3A, he also participated in the
decision and adoption of this opinion.

The right to formal political representation is fundamental to our state and national democracies.  In the second year following each Federal decennial census, the Maryland Constitution provides that the Governor and State Legislature shall reapportion the State's legislative representation consistent with the State's current demographics.  To protect the Federal and State legal rights that may be affected by this process, the Maryland Constitution also provides that the citizens of Maryland have the right to challenge this legislative apportionment scheme in this Court.  In the present case, we are called upon to consider the validity of Maryland's most recently enacted legislative apportionment plan against three such challenges.

## I.

### A.

Once every ten years, following each United States Census, Article III, § 5 of the Maryland Constitution[1] requires that the State's 47 Legislative Districts (also referred to

---

[1] Article III, § 5 of the  Maryland Constitution provides:

"Following each decennial census of the United States and after public hearings, the Governor shall prepare a plan setting forth the boundaries of the legislative districts for electing of the members of the Senate and the House of Delegates.

"The Governor shall present the plan to the President of the Senate and Speaker of the House of Delegates who shall introduce the Governor's plan as a joint resolution to the General Assembly, not later than the first day of its regular session in the second year following every census, and the Governor may call a special session for the presentation of his plan prior to the regular session.  The plan shall conform to Sections 2, 3, and 4 of this Article. Following each decennial census the General Assembly may by joint resolution adopt a plan setting forth the boundaries of the legislative districts for the election of members of the Senate and the House of Delegates, which plan shall conform to Sections 2, 3 and 4 of this Article. If a plan has been adopted by the General Assembly by the 45th day after the opening of the

as "Senate Districts") be reapportioned. Under this provision, the Governor's mandate is to formulate a new legislative apportionment plan in conformance with the requirements of Article III, §§ 2,[2] 3,[3] and 4[4]. Once the legislative apportionment plan is drafted, the Governor must submit the plan to both the President of the Senate and the Speaker of the House of Delegates, who then must introduce the Governor's plan as a Joint Resolution

---

regular session of the General Assembly in the second year following every census, the plan adopted by the General Assembly shall become law. If no plan has been adopted by the General Assembly for these purposes by the 45th day after the opening of the regular session of the General Assembly in the second year following every census, the Governor's plan presented to the General Assembly shall become law.

"Upon petition of any registered voter, the Court of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland."

[2] Section 2 provides:
"The membership of the Senate shall consist of forty-seven (47) Senators. The membership of the House of Delegates shall consist of one hundred forty-one (141) Delegates."

[3] Section 3 provides:
"The State shall be divided by law into legislative districts for the election of members of the Senate and the House of Delegates. Each legislative district shall contain one (1) Senator and three (3) Delegates. Nothing herein shall prohibit the subdivision of any one or more of the legislative districts for the purpose of electing members of the House of Delegates into three (3) single-member delegate districts or one (1) single-member delegate district and one (1) multi-member delegate district."

[4] Section 4 provides:
"Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions."

by the first day of the Legislature's regular session in the second year following the decennial United States census.  Unless the General Assembly adopts an alternative legislative apportionment plan by the forty-fifth day of that legislative session, the Governor's plan becomes law.

This Court has original jurisdiction to consider any challenges to the legal validity of the legislative apportionment plan.  Md. Const. Art.  III, § 5.  If the Enacted Plan fails legal scrutiny under the Maryland Constitution, the United States Constitution, or other controlling law, this Court shall deem the plan invalid and provide appropriate relief.  Id.

In March 2011, following the receipt of the 2010 census data for Maryland, the Governor convened a five member committee, the Governor's Redistricting Advisory Committee ("GRAC"), to draft and recommend, after holding public hearings and accepting public comment, a plan for the redistricting of the State's Congressional and Legislative Districts.[5]  The GRAC held 12 public hearings during the summer of 2011 and, on December 16, 2011, published its plan for the apportionment of the State's 47 Legislative Districts.

Following receipt of the GRAC committee's recommendations, the Governor presented a legislative apportionment plan to the Senate President and House Speaker, who introduced it in their respective Houses as Senate Joint Resolution 1 and House Joint

---

[5] The GRAC committee included Jeanne D. Hitchcock, Esq., the Governor's Appointments Secretary, as Chair; Thomas V. Mike Miller, Jr., President of the Maryland Senate; Michael E. Busch, Speaker of the Maryland House of Delegates; James King, a former member of the House of Delegates from Anne Arundel County; and Richard Stewart, Chief Executive Officer of Montgomery Mechanical Services.

Resolution 1. The Governor's plan became law on February 24, 2012 as revisions to Maryland Code (1984, 2004 Repl. Vol.) §§ 2-201 and 2-202 of the State Government Article.

The Attorney General, in anticipation of challenges being filed to the newly enacted plan, on March 2, 2012, filed a motion requesting this Court to issue an order promulgating the procedures to be followed in filing and considering any such challenges to the enacted legislative apportionment plan. On March 6, 2012, in response to the Attorney General's motion, we issued an order prescribing the schedule for filing challenges: any registered voter of the State who sought to challenge the Enacted Plan had to file a petition with the Clerk of the Court of Appeals no later than May 1, 2012, and the State's response and any amicus curiae briefs had to be filed no later than May 31, 2012. The order also appointed retired Court of Appeals Judge Alan M. Wilner as the Court's Special Master to conduct any required hearings.

The following petitions, among others,[6] challenging the Enacted Plan were filed:

1. Petition of Delores Kelley and James Bochin;
2. Petition of Christopher Eric Bourchat;
3. Petition of Cynthia Houser, et al.

On September 5, 2012, the Special Master held a hearing in accordance with the procedures promulgated by this Court. At the hearing, expert reports and other evidence

---

[6] The Petition of Douglass Howard, filed timely on May 1, 2012, was dismissed, on motion, on June 19, 2012. On July 11, 2012, Robert LePin and Sarah Few filed a petition challenging Legislative District 44. On August 17, 2012, the Court entered an Order dismissing the LePin and Few petitions as untimely.

were admitted without objection.   After the hearing, the Special Master issued his

recommendation that the enacted legislative apportionment plan be upheld against each of

the challenges.   Each party filed exceptions, as to which this Court held oral argument.

Following oral argument, we issued the following order:

> WHEREAS, pursuant to the provisions of Sec. 5 of Article III of the Constitution of Maryland, the Governor's legislative districting plan, introduced as House Joint Resolution No. 1 and Senate Joint Resolution No. 1, became effective on February 24, 2012, and
>
> WHEREAS, the Office of the Attorney General having filed a motion to promulgate procedures to govern any petitions brought under Article III, Sec. 5 of the Constitution of Maryland, and
>
> WHEREAS, challenges to the validity of the legislative districting plan having been filed and an evidentiary hearing having been held before a Special Master appointed by this Court, and
>
> WHEREAS, oral arguments on the challenging petitions and exceptions to the report of the Special Master having been held before this Court on November 7, 2012, and
>
> WHEREAS, the Court having determined that the Governor's plan is consistent with the requirements of the Constitution of the United States and the Constitution of Maryland, it is this 9th day of November, 2012,
>
> ORDERED, for reasons to be stated later in a written opinion, that the relief sought by Petitioners in these actions is denied.

In the Matter of 2012 Legislative Districting of the State, 429 Md. 301, 55 A. 3d

713 (2012).

We now provide a de novo review of the Special Master's legal conclusions, and

our reasons in support of the preceding order.

B.

We begin with a review of the applicable law common to each challenge, and the factual context in which the petitioners' challenges reached this Court.

Federal constitutional restraints on State legislative apportionment arise principally from the Fourteenth Amendment Equal Protection Clause in the so-called "one person, one vote" doctrine enunciated in Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964), and further iterated by this Court in its redistricting jurisprudence: In re Legislative Districting of State, 370 Md. 312, 805 A. 2d 292 (2002); Legislative Redistricting Cases, 331 Md. 574, 629 A. 2d 646 (1993); In re Legislative Districting, 299 Md. 658, 475 A. 2d 428 (1984); In re Legislative Districting, 271 Md. 320, 317 A. 2d 477 (1974). Under this rule, Maryland Senate Districts, single-member Delegate Subdistricts, and two-member Delegate Subdistricts must be approximately equal to one another in population. See In re Legislative Districting of State, 370 Md. 312, 356, 805 A. 2d 292, 318; see also Reynolds, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506; Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S. Ct. 1429, 23 L. Ed. 2d 595 (1964). This requirement generally is considered to be prima facie satisfied if the variation in population between any two legislative districts does not exceed 10%. See In re Legislative Districting of State, 370 Md. 312, 356, 805 A. 2d 292, 318; In re Legislative Redistricting Cases, 331 Md. at 592–594, 629 A. 2d at 655-56.

Article III, §§ 2 and 3 of the Maryland Constitution divide the State's population

-6-

into 47 Legislative Districts (also referred to as "Senate Districts").[7] Based on the 2010 census, Maryland had an adjusted population of 5,772,231 residents.[8] Therefore, based on the adjusted population size, equal apportionment among Maryland's 47 legislative districts translates to 122,813 residents per an ideal Legislative District; 40,938 residents per an ideal equally apportioned single-member Delegate Subdistrict; and 81,875 per an ideal equally apportioned two-member Delegate Subdistrict.

Beyond the "one person, one vote" principle, intentional and invidious ethnic discrimination in legislative apportionment is repugnant to the United States Constitution under both the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment. See Shaw v. Reno, 509 U.S. 630, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993). Legislative apportionment plans that effectively disenfranchise or abridge the right to vote of any citizen on account of "race or color" are prohibited by § 2 of the Voting Rights Act of 1965 (42 U.S.C. § 1973).[9]

---

[7] From each Legislative District there is to be elected one Senator to the Maryland State Senate and three Delegates to the Maryland House of Delegates. Each Legislative District may be subdivided into three Delegate Subdistricts, from each of which one Delegate is to be elected. Legislative Districts may also be divided into two Delegate Subdistricts, from one of which two Delegates are to be elected and from one of which one Delegate is to be elected.

[8] Although census data showed 5,773,552 actual residents, in formulating a legislative apportionment scheme, Maryland does not include incarcerated individuals, who were not residents of Maryland prior to their incarceration. See Maryland Code (1957, 2011 Repl. Vol., 2012 Supp.), Art. 24, § 1-111.

[9] 42 U.S.C. § 1973 provides in pertinent part:
"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 1973b (f) (2) of this title, as provided in

With respect to Maryland law, the provisions that govern the legislative redistricting process were adopted by the Maryland voters in 1970, see Ch. 785 of the Acts of 1970, and 1972; Ch. 363 of the Acts of 1972, when the State Constitution was amended.[10] In addition to the drafting procedures noted above, Article III, § 4 provides: "Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the

---

> subsection (b) of this section.
> "(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

[10] Four redistricting plans have been adopted since the adoption of the 1970 and 1972 amendments, and each of the plans has been challenged in this Court. In 1974, see In re Legislative Districting, 271 Md. 320, 317 A. 2d 477 (1974), this Court deemed the Governor's plan and the subsequent elections conducted pursuant to it, unconstitutional due to a procedural violation in the adoption of the plan. We then used the Governor's plan as a guide and developed our own legislative apportionment plan as a corrective measure. We found the 1982 plan to contain no legal violations despite several challenges. In re Legislative Districting, 299 Md. 658, 655, 475 A. 2d 428, 431 (1984). We approved the 1992 plan, but noted that it approached "perilously close" to violating Article III, § 4's due regard requirement. Legislative Redistricting Cases, 331 Md. 574, 614, 629 A. 2d 646, 666 (1993). In 2002, we found that the Enacted Plan contained an impermissible number of border crossings, in violation of Article, III § 4's due regard requirement. In re Legislative Districting of State, 370 Md. 312, 805 A.2d 292 (2002). In response, we drafted our own legislative apportionment plan because there was insufficient time for the political branches to redraw the Legislative Districts prior to the then pending election. Id. at 323, 805 A. 2d at 298.

boundaries of political subdivisions." Thus, Article, III § 4 of the Maryland Constitution requires that "[e]ach legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population" and that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions."[11] We have held that an excessive number of border crossings violates Article, III § 4's due regard requirement, and have described adherence to this provision, along with the applicable Federal law, as "the essential prerequisite of any redistributing plan." In re Legislative Districting of State, 370 Md. at 321, 805 A.2d at 297. Non-compliance with this requirement is only permissible when it conflicts with a superseding Federal law, or a more important State constitutional requirement. Id. at 353-54, 805 A. 2d at 316.

We have further explained that:

> "This is not to say that, in preparing the redistricting plans, the political branches, the Governor and General Assembly, may consider only the stated constitutional factors. On the contrary, because, in their hands, the process is in part a political one, they may consider countless other factors, including broad political and narrow partisan ones, and they may pursue a wide range of objectives. Thus, so long as the plan does not contravene the constitutional criteria, that it may have been formulated in an attempt to preserve communities of interest, to promote regionalism, to help or injure incumbents or political parties, or to achieve other social or political objectives, will not affect its validity.

> "On the other hand, notwithstanding that there is necessary flexibility in how the constitutional criteria are applied - the districts need not be exactly equal in population or perfectly compact and they are not absolutely prohibited from crossing natural or political subdivision boundaries, since they must do so if necessary for population parity - those non-constitutional criteria cannot override the constitutional ones. We made this clear in both

---

[11] Cities and counties constitute political subdivisions for purposes of Article III, § 4 of the Maryland Constitution.

our 1984 and 1993 decisions. Specifically, we acknowledged the importance of natural and subdivision boundaries and rejected the argument that such things as the promotion of regionalism and the protection of non-official communities of interest could overcome that requirement. The Legislature apparently understood and acquiesced in that ruling, as no attempt was made in the intervening decades to amend the Constitution and, thereby, include those or any other factors in the constitutional framework."

In re Legislative Districting of State, 370 Md. at 321-22, 805 A.2d at 297. Thus, despite the aforementioned restrictions, we have recognized that the political branches, the Governor and General Assembly, are given a wide-berth in formulating a legislative apportionment scheme. So long as the plan they devise does not violate State or Federal law, the political branches may pursue a wide variety of objectives, including preserving community interests, promoting of regionalism, and aiding political allies or injuring political rivals. Id.

Because Article III, § 4 of Maryland Constitution was only ratified in 1972 and the Legislature only reapportions itself once every ten years, this Court has only on four prior occasions considered the constitutional propriety of a legislative apportionment plan under the requirements of Article III, § 4 – In re Legislative Districting of State, 370 Md. 312, 805 A. 2d 292 (2002); Legislative Redistricting Cases, 331 Md. 574, 629 A. 2d 646 (1993); In re Legislative Districting, 299 Md. 658, 475 A. 2d 428 (1984); In re Legislative Districting, 271 Md. 320, 317 A. 2d 477 (1974). Only in two of those opinions, Legislative Redistricting Cases, 331 Md. 574, 629 A. 2d 646 (1993), and In re Legislative Districting of State, 370 Md. 312, 805 A. 2d 292 (2002), did we provide substantive analysis of the due regard requirement.

-10-

Under the 1992 redistricting plan, there were a total of 18 multi-county crossings statewide, five more than existed under the 1982 plan.  See Legislative Redistricting Cases, 331 Md. at 613-14, 629 A. 2d at 666-67.  Baltimore County was involved in seven of them, five were shared with Baltimore City, and one each shared with Harford County and Howard County.  See id. at 613, 629 A. 2d at 665.  Although the Court sustained the plan against a due regard challenge under Article III, § 4 of the Maryland Constitution, the Court warned that the plan came "perilously close" to violating the due regard requirement because of the relatively high number of border crossings.  Id. at 614, 629 A. 2d at 666.

The 2002 Enacted Plan increased the number of border crossings  from 18 to 22. In In re Legislative Districting of State, 370 Md. 312, 805 A. 2d 292 (2002), we considered the constitutional validity of that plan.  We specifically addressed the question of whether a constitutional requirement, such as the Article III, § 4's due regard requirement, could be subordinated to non-constitutionally mandated justifications.  See id. at 370, 805 A. 2d at 326.  The State argued that the due regard requirement could be subordinated to such non-constitutional justifications.  See id. at 366, 805 A. 2d at 324. We disagreed, holding that constitutional requirements, such as the due regard requirement, are mandatory requirements.  Id. at 356, 805 A. 2d at 318.  As such, the due regard requirement, we said, cannot be subordinated to justifications not mandated by the Federal or State Constitutions.  Id. at 371-72, 805 A. 2d at 327-28.  We concluded that the plan contained an excessive number of political subdivision crossings that could not be

-11-

constitutionally justified. Id. at 368, 805 A. 2d at 325. We concluded from this that the plan violated Article III, § 4's requirement that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions," and was, therefore, constitutionally deficient. Id. at 374, 805 A. 2d at 328. Due to the then pending 2002 election, there was insufficient time for the Court to return the plan for correction to the General Assembly. We therefore created a districting plan in compliance with State and Federal law that paid no deference to the ordinarily permissible political considerations. Id. at 323, 805 A. 2d at 298.[12]

Our legislative apportionment plan reduced the number of political subdivision crossings from 22 under the Governor's 2002 plan to 14, all of which were required to achieve substantial population equality, and eliminated all multi-county districts between Baltimore County and Baltimore City. Baltimore County, based on the 2000 Census, had an adjusted population of 754,292, five legislative districts entirely within the county, and two shared districts with Carroll, Harford, and Howard Counties, respectively. Baltimore

---

[12] The Court explained:

> "When the Court drafts the plan, it may not take into account the same political considerations as the Governor and the Legislature. Judges are forbidden to be partisan politicians. Nor can the Court stretch the constitutional criteria in order to give effect to broader political judgments, such as the promotion of regionalism or the preservation of communities of interest. More basic, it is not for the Court to define what a community of interest is and where its boundaries are, and it is not for the Court to determine which regions deserve special consideration and which do not."

In re Legislative Districting of State, 370 Md. at 323, 805 A.2d at 298 (2002).

City, which, based on the 2000 Census, had an adjusted population of 651,154, received six legislative districts all entirely inside of its city limits.

In the decade between the 2000 Census and the 2010 Census, the adjusted population of Baltimore City fell from 651,154 to 624,054, while the adjusted population of Baltimore County increased from 754,292 to 807,053. The adjusted population of the State according to the 2010 census, as indicated, was 5,772,231, so that an equal distribution of population across each of the 47 legislative districts, an "ideal" district (a district representing 1/47th of eligible voters) would contain approximately 122,813 people. The population of Baltimore City, at an adjusted population of 624,054, would, therefore, equal and thus justify, roughly 5.1 "ideal" legislative districts. Baltimore County, at an adjusted population of 807,053, would, therefore, equal and thus justify, roughly 6.5 ideal legislative districts. Although Baltimore City's population equals little more than five ideal legislative districts, the 2012 Enacted Plan assigns six legislative districts to Baltimore City. Five of these districts exist entirely within Baltimore City.[13]

---

[13] In the previous plan, District 44 covered the southwestern portion of Baltimore City and did not cross any political subdivision boundary. District 10 sat entirely within Baltimore County and abutted Baltimore City's western border, including District 41. District 42 existed entirely within Baltimore County. It abutted the northern border of Baltimore City, and extended northward about one-third of the way to the Pennsylvania line.

The remaining legislative district, District 44,[14] crosses into Baltimore County, and is the basis for several of the challenges to the Enacted Plan. [15]

These challengers, as do all challengers to a legislative reapportionment plan, carry the burden of demonstrating the law's invalidity. See In re Legislative Districting of State, 370 Md. at 336, 805 A. 2d at 306. Once, however, a proper challenge under Article III, § 4 is made and is supported by "compelling evidence," the State has the burden of producing sufficient evidence to show that the districts are contiguous and compact, and that due regard was given to natural and political subdivision boundaries. Legislative Redistricting Cases, 331 Md. at 613-14, 629 A.2d at 666.

II.

On April 26, 2012, the petitioner, Christopher Eric Bouchat filed, pro se, a "Motion to Declare Maryland General Assembly Joint Resolution No. 1, 2012 Unconstitutional & Hence Null and Void." The Special Master treated that pleading as a

---

[14] In addition to reconfiguring District 44 to extend across the Baltimore City and Baltimore County lines, the drafters of the Enacted Plan also split District 44 into two delegate subdistricts, Subdistricts 44A and 44B. The drafters drew Subdistrict 44A entirely within Baltimore City, and Subdistrict 44B entirely within Baltimore County. Most of the territory contained within Subdistrict 44B in the Enacted Plan, constituted part of District 10 under the our 2002 plan. District 10, as a result, no longer shares a contiguous border with Baltimore City, extends to the Carroll County line, and contains a large mixture of ethnic populations. To accommodate the extension of District 44, District 42 was shortened in width and split into two delegate subdistricts. One of the two districts is a single-member Delegate Subdistrict that sits along the northern border of Baltimore City. The other subdistrict contained in District 42 is a two delegate subdistrict, which extends in a northerly direction up to the Pennsylvania state line.

[15] The Enacted Plan contains 13 total border crossings statewide, one fewer than the 14 contained in the previous plan.

-14-

timely challenge, under Article III, § 5 of the Maryland Constitution, to the Enacted Plan. In his petition, the petitioner proposed that the bicameral scheme prescribed in the Federal Constitution for the organization of the Legislative Branch of the Federal Government similarly applies to the organizational structure of the legislative branches of the various states. Noting that Article I, §§ 2 and 3 of the U.S. Constitution provides for a House of Representatives, that, subject to each State having at least one Representative, must be apportioned among the States according to population, and a Senate consisting of two Senators from each state, he reasons that the Federal Constitution impliedly requires every state legislature to establish an identical structure. Proceeding on this premise, he argues that multi-member districts or districts that cross county lines are strictly prohibited, that each county in Maryland and Baltimore City must have at least one Delegate in the House of Delegates and that the Maryland Senate must consist of two Senators from each county and Baltimore City. This Court should correct these errors, the petitioner maintains, through its judicial power by:

"(1) declaring Article III, § 3 of Maryland Constitution, which permits Maryland's multi-member House of Delegates, null and void;
"(2) declaring Article III, § 2 of the Maryland Constitution null and void;
"(3) requiring that all delegates be elected from single-member districts;
"(4) prohibiting House of Delegates subdistricts from crossing county lines; and
"(5) requiring that each county be entitled to one Delegate and that all other Delegate seats be apportioned according to population."

In addition to Article I, §§ 2 and 3 of the Federal Constitution, the petitioner relies on selected portions of the Federalist Papers,[16] the Fourteenth Amendment's Privileges and Immunities Clause, the guarantee of Article IV, § 4 of the U.S. Constitution that each State have a republican form of government, Article II, § 1 of the U.S. Constitution,[17] and the Ninth and Tenth Amendments to that Constitution.

Responding to the State's motion that the petition be dismissed without evidentiary hearing as failing to state a cognizable claim, as a matter of law, the Special Master, noting that this Court had not acted to dismiss the petition and that the petitioner participated in the evidentiary hearing, concluded that the Bouchat petition would be determined upon its merits. The Special Master then proceeded to address those merits. His reasoning and recommendation are as follows:

"**Analysis and Recommendation**

"Mr. Bouchat's first argument, that the structure of Congress directed in Article I, §§ 2 and 3 of the U.S. Constitution is a required template for the States, is without merit. The text of those provisions, by their clear wording, apply only to the structure of Congress and do not purport in any way to control the structure of State legislatures, much less to require a State legislative apportionment that would produce significant population

---

[16] The petitioner cites The Federalist Papers No. 23: Hamilton, No. 39: Madison, No. 44: Madison, No. 46: Madison, No. 47: Madison, No. 51: Madison, No. 62: Madison, and No. 63: Madison.

[17] U.S. Const. art. II, § 1, cl. 2:

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."

disparities or to require single-member districts that do not cross county lines. Apart from the lack of any such textual requirement, the Supreme Court, in Reynolds v. Sims, supra, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 expressly rejected 'the applicability of the so-called federal analogy to state legislative apportionment arrangements,' holding that 'the Founding Fathers clearly had no intention of establishing a pattern or model for the apportionment of seats in state legislatures when the system of representation in the Federal Congress was adopted.'  Id. at 572-73, 84 S.Ct. At 1387, 12 L.Ed.2d at 534-35.

"Nor does the guaranty of a republican form of government in Article IV, § 4 of the U.S. Constitution create a Federal Constitutional basis for judicial relief.  See Baker v. Carr, 369 U.S. 186, 218-24, 82 S.Ct. 691, 710-13, 7 L.Ed.2d 663, 686-89 (1962), where the Supreme Court flatly rejected Article IV, § 4 as a basis for judicial review of a State's legislative apportionment plan.  See also New York v. United States, 505 U.S. 144, 184, 112 S.Ct. 2408, 2432, 120 L.Ed.2d 120, 155 (1992).

"The Federal Constitution constraints on State legislative districting are those arising from the Equal Protection Clause of the Fourteenth Amendment, the principal one being the 'one person/one vote' requirement announced in Reynolds v. Sims, under which, as this Court iterated in Matter of Legislative Districting, supra, 370 Md. at 325, 805 A.2d at 299, "the states are required to apportion both houses of their legislatures on an equal population basis, to assure that one citizen's vote is approximately equal in weight to that of every other citizen." (Emphasis added).

"In light of the State's current demographic distribution, the supervening Constitutional requirement of substantially equal population in both Senate Districts and Delegate Subdistricts absolutely precludes any apportionment scheme under which each county would be entitled to two (or any other equal number of) Senators.  Under such a scheme, Kent County, with an adjusted population of 20,266, and Montgomery County, with an adjusted population of 972,338, would each be entitled to two Senators, giving each resident in Kent County 48 times the voting strength of a resident in Montgomery County.  A similar scheme was expressly rejected in Reynolds v. Sims, and as well in the companion case of Maryland Committee for Fair Representation v. Tawes, supra, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595.

-17-

"Unless the size of the House of Delegates were to be expanded five to ten-fold, any requirement that each county be entitled to one Delegate would be doomed for the same reason.  See Maryland Committee, supra.  As Article III, §§ 2 and 3 of the Maryland Constitution provide for 141 members of the House of Delegates, to be elected from 47 Legislative Districts, three from each district, and as there is no Federal Constitutional impediment to that provision, the apportionment of the House of Delegates on any basis other than substantial equality of population is impermissible.

"Finally, in his petition, Mr. Bouchat contends that multi-member Delegate districts are prohibited under Federal Constitutional law and that, to the extent they may be permitted, they may not cross county lines.  Multi-member districts, he avers, 'institute voting inequality upon the populous,' and combining parts of two or more counties in a single district 'caus[es] a minority county section to be dis-enfranchised by the majority county portion of the district.'  He offers no facts to show that any particular multi-member or multi-county district has produced that effect, however, other than noting generally that since the Civil War, with limited exceptions, the Democratic Party has controlled the House of Delegates.  .

"The Supreme Court, on a number of occasions, has expressed concern over certain undesirable features of multi-member districts, especially as they may dilute the ability of racial or ethnic minorities in such districts to elect members of their group to legislative office.  So far, however, the Court has made clear that such a district is not per se unlawful under the Equal Protection Clause.   The clearest expression of the Court's view is in Whitcomb v. Chavis, 403 U.S. 124, 142-43, 91 S.Ct. 1858, 1868-69, 29 L.Ed.2d 363, 375-76 (1971):

> 'In Lucas v. Colorado General Assembly, 377 U.S. 713 (1964), decided with Reynolds v. Sims, we noted certain undesirable features of the multi-member district but expressly withheld any intimation 'that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective.'     377 U.S. at 731, n.21. Subsequently, when the validity of the multi-member district, as such, was squarely presented, we held that such a district is not per se illegal under the Equal Protection Clause. [citations omitted].  That voters in multi-member districts vote for and are represented by more legislators than voters in single-

-18-

member districts has so far not demonstrated an invidious discrimination against the latter. But we have deemed the validity of multi-member district system justiciable, recognizing also that they may be subject to challenge where the circumstances of a particular case may 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.[']

'[W]e have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements.'

"See also Thornburg v. Gingles, 478 U.S. 30, 48, 106 S.Ct. 2752, 2765, 92 L.Ed.2d 25, 45 (1986); In re Legislative Redistricting, supra, 299 Md. at 673, 475 A.2d at 435; Legislative Redistricting Cases, supra, 331 Md. at 606, 629 A.2d at 662.

"The additional references in Mr. Bouchat's pre-hearing memorandum to Article I, § 1 of the Federal Constitution (the method of electing the President) and the Ninth and Tenth Amendments are to no avail. He does not explain how the Enacted Plan violates any of the provisions, and none are apparent.

"As Mr. Bouchat, who has the burden of production and persuasion on this issue, has failed to show that any multi-member district provided for in the Enacted Plan would have the effect of diluting or canceling the voting strength of any racial or political element, he has failed to make a case for declaring any such district unlawful. With respect to the complaint about a multi-member district including parts of more than one county, there is no Federal prohibition against such a district, but is more a matter of compliance with the requirement in Article III, § 4 of the Maryland Constitution that, in the creation of any district or subdistrict, due regard be given to natural and political boundaries. As the Court has made clear, however, if a multi-county district or subdistrict is created in order to gratify some supervening requirements - equivalent population, compliance with the Voting Rights Act - then the 'due regard' requirement may be regarded as either yielding or complied with. It is 'the most fluid of the constitutional component outlined § 4.' In re Legislative Districting, supra, 299 Md. at 681, 475 A.2d at 439.

**"For these reasons, it is recommended that Mr. Bouchat's petition be denied."**

(Footnotes omitted) (emphasis in original).

The petitioner excepts to the recommendation of the Special Master, arguing that the "one person, one vote" doctrine exists in violation of rights granted under the Fourteenth Amendment and Article IV, § 4 of the United States Constitution. In support of his exception he notes that our government is a democratically elected federalist republic, which protects the voting rights of citizens who live in less populated political sub-divisions through the Electoral College and the balance of representation in the U.S. Senate. Without clear or detailed explication, he argues that, under the Fourteenth Amendment, "voting rights" must be uniform whether in the federal or state system. In addition to his general exception to the Special Master's recommendation, the petitioner specifically argues that the Special Master failed to address adequately the purported impropriety of having multi-member districts with varying numbers of Delegates. He argues, again without clear explication, that this apportionment structure violates every premise of the "one person, one vote" principle and, in addition, offends the Fourteenth Amendment and Article IV, § 4 of the United States Constitution.

We conclude that the petitioner has not met the required burden to properly challenge the Enacted Plan. The petitioner's challenge is not supported, as required under Article III, § 4, by "compelling evidence," "demonstrat[ing] that the plan has subordinated mandatory constitutional requirements to substantial improper alternative

-20-

considerations." Matter of Legislative Districting, 370 Md. at 373, 805 A. 2d at 328. Accordingly, the petitioner's exceptions to the Special Master's findings and recommendations are without merit and we, therefore, adopt the Special Master's recommendation to deny the Bouchat petition.

III.

A.

The petitioners, Delores Kelley and James Brochin, are registered voters and incumbent members of the Maryland Senate from Baltimore County.[18] They claim that the Enacted Plan violates Article III, § 4's requirement that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions" (also referred to as the "due regard requirement"). This is so, they contend, because the Enacted Plan contains a border crossing between political subdivisions, Baltimore City and Baltimore County, not required by law and allegedly constructed for the purpose of retaining six state senators in Baltimore City.

The petitioners alleged in their petition that the reconfiguration of Legislative Districts 10, 42, and 44 in the Enacted Plan violates the due regard requirement of Article III, § 4 of the Maryland Constitution. They argued that, because the population of Baltimore City justifies no more than five Legislative Districts, while the population of Baltimore County entitles it to at least six Legislative Districts, neither the border crossing nor the extension of District 44 into Baltimore County was necessary to

---

[18] Senator Kelley represented District 10 as it existed under the 2002 Plan and Senator Brochin represented District 42 as it existed under the 2002 Plan.

accomplish either population equality or voting rights protection for any racial or ethnic minority. For this reason, the petitioners further argued, the effect of the border crossing and extension is to underpopulate the Baltimore City Districts, in order to make it possible that Baltimore City will be able to elect six Senators, rather than five. The petitioners' request is that this Court hold that the provisions of the Enacted Plan, relating to Baltimore City and Baltimore County, violate the due regard requirement of Article III, § 4, and that this Court create a new map that removes the subdivision crossing between Baltimore City and Baltimore County.

The State responded to the petitioners' challenge with a motion to dismiss and, in the alternative, for favorable summary disposition. It argued, in support of its dispositive motions, that a single crossing between one county into another, such as the one between Baltimore City and Baltimore County in the Enacted Plan, cannot alone determine whether the Enacted Plan satisfies the due regard requirement. The State asserted, furthermore, that this Court has never determined the legal validity of a reapportionment scheme on the basis of a single border crossing. Instead, the State said this Court's due regard jurisprudence considers the constitutional validity of a reapportionment plan "holistically," meaning on a statewide basis. Proceeding on this premise, noting, in that regard, that the petitioners only challenged the validity of the Enacted Plan in one portion of the State, it contended that the petitioners failed to make a valid legal challenge. The State also observed that, because the Enacted Plan contained fewer border crossings,