| 2012 LEGISLATIVE | * | Misc. Nos. 1, 2, 3, 4, 5, 9 |
|---|---|---|
| DISTRICTING OF THE STATE | * | September Term, 2012 |

\*     \*     \*     \*     \*

## TO THE HONORABLE, THE JUDGES OF THE COURT OF APPEALS OF MARYLAND

### REPORT OF THE SPECIAL MASTER

#### INTRODUCTION

The mandated procedure for adjusting the boundaries of the State's 47 Legislative Districts following a dicennial national census is set forth in Article III, § 5 of the Maryland Constitution.  In relevant part, that section requires the Governor to prepare a plan setting forth the boundaries of the Legislative Districts and to present that plan to the President of the Senate and the Speaker of the House of Delegates.  The plan must conform to Article III, §§ 2, 3, and 4.  The President and Speaker must introduce the Governor's plan as a Joint Resolution not later than the first day of the Legislature's regular session in the second year following the census.  If the General Assembly fails, by its own Joint Resolution, to adopt an alternative districting plan by the forty-fifth day after the opening of that session, the Governor's plan becomes law.

There is no claim by any of the petitioners of non-compliance with the *procedural* requirements of Article III, § 5.  Following receipt of the 2010 census data for Maryland in March 2011, the Governor, in July 2011, appointed a five-member Governor's

- 1 -

Appendix B
3a

Redistricting Advisory Committee (GRAC) to hold public hearings, receive public comment, and draft and recommend to the Governor a plan for the redistricting of the State's Congressional and Legislative Districts.[1]  GRAC conducted 12 public hearings during the summer of 2011, and, on December 16, 2011, released its recommended plan for new Legislative District boundary lines.[2]  The GRAC recommendation was unanimous.

After public notice, the Governor held a public hearing on GRAC's recommended plan on December 22, 2011, and thereafter, with certain relatively minor amendments, presented the plan to the Senate President and House Speaker who, on January 11, 2012 – the first day of the General Assembly's 2012 regular session – introduced it in their respective Houses in the form of Senate Joint Resolution 1 and House Joint Resolution 1. As no other plan was adopted by Joint Resolution of the General Assembly by February 24, 2012 – the forty-fifth day of the session -- the Governor's plan, hereafter referred to as the Enacted Plan, became law, and the Legislative Districts set forth in the revisions to Maryland Code, §§ 2-201 and 2-202 of the State Government Article made by the two

---

[1] GRAC consisted of Jeanne D. Hitchcock, Esq., the Governor's Appointments Secretary, as Chair; Thomas V. Mike Miller, Jr., President of the Maryland Senate; Michael E. Busch, Speaker of the Maryland House of Delegates; James King, a former member of the House of Delegates from Anne Arundel County; and Richard Stewart, Chief Executive Officer of Montgomery Mechanical Services. Ms. Hitchcock, Senator Miller, Speaker Busch, and Mr. Stewart are Democrats. Mr. King is a Republican.

[2] GRAC released its recommended plan for Congressional redistricting in October 2011. This Report deals only with the Legislative redistricting applicable to the Maryland General Assembly.

4a

Joint Resolutions took effect.

Article III, § 5 of the Constitution further provides that, upon petition of any registered voter, the Court of Appeals has original jurisdiction to review the legislative districting of the State and to grant appropriate relief if it finds that the districting is not consistent with the U.S. or Maryland Constitution.

On March 2, 2012, anticipating that there may be petitions filed challenging the redistricting adopted in the two Joint Resolutions, the Attorney General filed a motion asking the Court to issue an Order promulgating appropriate procedures to govern any such challenges. On March 6, 2012, the Court entered such an Order. The Order required that any registered voter of the State who contends that any part of the Enacted Plan is invalid could file a petition with the Clerk of the Court on or before May 1, 2012 and that the State's response to any such petitions and any *amicus curiae* briefs be filed by May 31, 2012. The Order also appointed the undersigned as the Court's Special Master and directed that additional procedures and deadlines be determined by further Order of the Court. The Attorney General's motion and the Court's March 6 Order were docketed as Misc. No. 1 of the September 2012 Term.

During the period allowed by the Court's March 6 Order, the following four petitions challenging all or parts of the Enacted Plan were filed:

> (1) Petition of Christopher Eric Bouchat, filed April 26, 2012 (Misc. No. 2);
>
> (2) Petition of Delores Kelley and James Brochin filed May 1, 2012 (Misc.

- 3 -

5a

No. 3);

> (3) Petition of Douglas Howard, *et al.* filed May 1, 2012 (Misc. No. 4); and
>
> (4) Petition of Cynthia Houser, *et al.* filed May 1, 2012 (Misc. No. 5).

On May 30, 2012, the Court, upon consideration of Interim Report No. 1 of the Special Master, entered a scheduling Order for further proceedings, directing that the State's responses to the petitions be filed by June 7, 2012, that expert reports be filed by June 15, that hearings be held in early September, that the Special Master file a Report by October 12, 2012, that any exceptions to that Report be filed by October 22, 2012, and that a hearing on any exceptions would be held at a time to be determined later by the Court. That Order was amended in minor respects on June 18, 2012.

The State's response to the Bouchat petition (Misc. No. 2) was in the form of a motion to dismiss on the ground that the legal theories cited in the petition fail to state a claim as a matter of law. The responses to the Kelley/Brochin and Houser petitions (Misc. Nos. 3 and 5) were in the form of a motion to dismiss or, in the alternative, for summary judgment. The motion to dismiss alleged that the only legal theories asserted in the petitions failed to state a claim as a matter of law. The motion for summary judgment claimed that there was no genuine dispute of material fact and that the State was entitled to judgment as a matter of law. It is clear from the accompanying memoranda that the State was seeking "preliminary or summary disposition" without the need for the presentation of evidence.

- 4 -

6a

The Court has not ruled on the State's motions and thus has effectively denied preliminary or summary disposition. In accordance with the Court's May 30, 2012 Order, evidence was submitted by all parties in Misc. Nos. 2, 3, and 5, and that evidence, to some extent, is in sharp dispute. In light of that fact, it would appear that, under traditional principles governing those kinds of motions, neither a motion to dismiss nor a motion for summary judgment may now be granted, at least with respect to Misc. Nos. 3 and 5. Without objection from the parties, the Special Master has treated the State's responses as in the nature of answers to the petitions that preserve the State's legal arguments but permit the Special Master and the Court to consider the statements of the experts and the other evidence presented by the parties and render decisions based on both the factual and legal merits of the petitions and responses.

On June 19, 2012, a Notice of Dismissal of the Howard petition (Misc. No. 4) was filed. The Court accepted the dismissal on June 21. On July 11, 2012, Robert LePin and Sara Few filed a petition challenging the validity of Legislative District 44 (Misc. No. 9). On July 16, they filed an amended petition challenging that District. On August 17, 2012, the Court entered an Order dismissing the LaPin and Few petitions as being untimely. **There thus remain for resolution only Misc. Nos. 2, 3, and 5.** Proceedings before the Special Master on those petitions took place in accordance with the amended scheduling order. Reports of experts were duly filed, and a hearing was held on September 5, 2012, at which those reports and other evidence were admitted without objection as to

- 5 -

7a

admissibility.

## PROPOSED GENERAL GOVERNING FACTS AND PRINCIPLES

### **Maryland Population**

Maryland's population, according to the 2010 census, was 5,773,552. Under Maryland law, however, (i) the population count for purposes of creating Legislative Districts is not to include individuals who are incarcerated in a State or Federal correctional facility but who were not residents of Maryland prior to their incarceration, and (ii) incarcerated individuals who *were* Maryland residents prior to their incarceration shall be regarded as residents at their last known residence prior to their incarceration, rather than the location of the place of incarceration. *See* Maryland Code, Art. 24, § 1-111[3] Applying that law, the adjusted State population for districting purposes is 5,772,231.[4]

### **Number of Districts**

Article III, Sections 2 and 3 of the Maryland Constitution divide the State into 47 Legislative Districts, from each of which is to be elected one Senator and three Delegates.

---

[3] The Constitutionality of that law was sustained in *Fletcher v. Lamone*, 831 F. Supp.2d 887 (D. Md. 2011), *aff'd on summary disposition*, 567 U.S.    (June 25, 2012, No. 11-1178).

[4] The population figures used in this Report are the census figures, as adjusted.

8 a

Those Legislative Districts (hereafter sometimes referred to as Senate Districts) may be
subdivided into (i) three Delegate Subdistricts from each of which one Delegate is to be
elected or (ii) two Delegate Subdistricts, from one of which two Delegates are to be
elected and from one of which one Delegate is to be elected. Accordingly, an "ideal" –
*i.e.*, mathematically equal – Senate District would contain 122,813 people; an "ideal"
single-member Delegate Subdistrict would contain 40,938 people; and an "ideal" two-
member Delegate Subdistrict would contain 81,875 people.

### Redistricting Procedure

The required procedure for revising the boundaries of the Legislative Districts or
subdistricts following each dicennial census is set forth in Article III, Section 5 of the
Constitution. *See In re Legislative Districting*, 271 Md. 320, 317 A.2d 477 (1974);
*Legislative Redistricting Cases*, 331 Md. 574, 629 A.2d 646 (1993). Although two of the
three viable petitions contend that the Enacted Plan is not substantively consistent with
Article III, §§ 2, 3, or 4, which § 5 requires, there is no contention that the *procedural*
requirements of § 5 were not satisfied.

### Population Equality

The Senate Districts, the single-member the Delegate Subdistricts, and the two-
member Delegate Subdistricts must, respectively, be substantially equal in population – as

- 7 -

$9_a$

nearly equal as practicable. That requirement is founded both on the Equal Protection
Clause of the Fourteenth Amendment and on Maryland Constitutional law. *Reynolds v.
Sims*, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed.2d 506 (1964); *Maryland Committee for
Fair Representation v. Tawes*, 377 U.S. 656, 84 S. Ct. 1429, 12 L. Ed.2d 595 (1964);
*Matter of Legislative Districting*, 370 Md. 312, 356, 805 A.2d 292, 318 (2002). The
requirement generally is considered at least as *prima facie* satisfied if the deviation from
mathematical population equality between the *most* populous district and the *least*
populous district does not exceed 10%. *Gaffney v. Cummings*, 412 U.S. 735, 93 S. Ct.
2321, 37 L. Ed.2d 298 (1973); *Voinovich v. Quilter*, 507 U.S. 146, 113 S. Ct. 1149. 122
L. Ed.2d 500 (1993); *Legislative Redistricting Cases, supra*, 331 Md. 574, 592-95; *also
Larios v. Cox*, 300 F. Supp.2d 1320, *aff'd without opinion, Cox v. Larios*, 542 U.S. 947,
124 S. Ct. 2806, 159 L. Ed.2d 831 (2004) (hereafter *Larios*). There is further discussion
of these principles in the sections of this Report dealing with the individual petitions.

## Racial or Ethnic Discrimination

Deliberate and invidious racial discrimination in legislative districting has been
held Constitutionally prohibited under both the Fifteenth Amendment and the Equal
Protection Clause of the Fourteenth Amendment. *Shaw v. Reno*, 509 U.S. 630, 113 S. Ct.
2816, 125 L. Ed.2d 511 (1993); *Bartlett v. Strickland*, 556 U.S. 1, 24, 129 S. Ct. 1231,
1249, 173 L. Ed.2d 173, 191 (2009). Districting plans that have the *effect* of denying or

- 8 -

/0 a

abridging the right of any citizen to vote on account of race or color are prohibited by § 2

of the Voting Rights Act of 1965 (42 U.S.C. § 1973). That section provides:

> "(a) No voting qualification or prerequisite to voting or
> standard, practice, or procedure shall be imposed or applied
> by any State or political subdivision in a manner which results
> in a denial or abridgment of the right of any citizen of the
> United States to vote on account of race or color, or in
> contravention of the guarantees set forth in [42 U.S.C. §
> 1973b(f)(2)] as provided in section (b).
>
> (b) A violation of section (a) is established if, based on the
> totality of the circumstances, it is shown that the political
> processes leading to nomination or election in the State or
> political subdivision are not equally open to participation by
> members of a class of citizens protected by section (a) in that
> its members have less opportunity than other members of the
> electorate to participate in the political process and to elect
> representatives of their choice. The extent to which members
> of a protected class have been elected to office in the State or
> political subdivision is one circumstance which may be
> considered: *Provided*, that nothing in this section establishes a
> right to have members of a protected class elected in numbers
> equal to their proportion in the population."[5]

### Compactness; Due Regard for Natural and Political Boundaries

Article III, § 4 of the Maryland Constitution requires that "[e]ach legislative

district shall consist of adjoining territory, be compact in form, and of substantially equal

---

[5] Section 1973 (section 2 of the Voting Rights Act) applies in all 50 States.
Section 5 of the Voting Rights Act (42 U.S.C. § 1973c) precludes certain States and
subdivisions from changing their election laws without prior approval of the Attorney
General of the United States or the U.S. District Court for the District of Columbia. That
section does not apply to Maryland. *Legislative Redistricting Cases, supra*, 331 Md. at
603, 629 A.2d at 660.

*11a*

population" and that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions." Counties and municipal corporations constitute political subdivisions for purposes of Article III, § 4.

### Other Considerations

So long as it does not contravene Constitutional requirements or the Federal Voting Rights Act, a districting plan created by the Governor or General Assembly may pursue a wide variety of objectives, including the preservation of communities of interest, promotion of regionalism, and helping or injuring incumbents or political parties. *Matter of Legislative Districting, supra*, 370 Md. at 321-22, 805 A.2d at 297.

### Presumption of Validity; Burden of Proof

A legislative districting plan adopted pursuant to Article III, § 5 of the Constitution is entitled to a presumption of validity, but that presumption "may be overcome when compelling evidence demonstrates that the plan has subordinated mandatory constitutional requirements to substantial improper alternative considerations." *Matter of Legislative Districting, supra*, 370 Md. at 373, 805 A.2d at 328 (quoting from *Legislative Redistricting Cases, supra*, 331 Md. at 614, 629 A.2d at 666).

The burden of proving a violation of the Federal requirements clearly rests with those who challenge the Enacted Plan – the petitioners. Once a proper challenge under

- 10 -

/2a

Article III, § 4 is made and supported by "compelling evidence," however, the State has

the burden of producing sufficient evidence to show that the districts are contiguous and

compact and that due regard was given to natural and political subdivision boundaries.

*Matter of Legislative Districting, supra*, 370 Md. at 336-37, 805 A.2d at 306.[6]

## MISCELLANEOUS NO. 2
## PETITION OF CHRISTOPHER ERIC BOUCHAT

### The Complaint

Mr. Bouchat filed a *pro se* "Motion to Declare Maryland General Assembly Joint

Resolution No. 1, 2012 Unconstitutional & Hence Null and Void," which, despite its

---

[6] The State has taken the position that, because the Enacted Plan enjoys the presumption of validity, the burden is on the petitioners to prove a violation of the compactness and "due regard" provisions of Article III, § 4, and that, only if the Court determines preliminarily that the Plan does not comply with those requirements does the burden shift to the State to prove that it does so comply. In its 2002 decision, *Matter of Legislative Districting, supra*, 370 Md. at 336, 805 A.2d at 306, the Court stated that the State "shall have the burden of producing sufficient evidence to show . . . that the districts in the Governor's Legislative Redistricting Plan are contiguous . . . that they are compact, and . . . the due regard was given to natural and political subdivision boundaries." The State's position is based on the fact that that language follows the statement that the Court previously had concluded that "sufficient evidence had been presented to preclude a finding that the Governor's Legislative Redistricting Plan [wa]s valid as a matter of law" and that no such finding has yet been made by the Court in this case. The Special Master believes that a special bifurcated summary judgment-type of proceeding, as was conducted in 2002, is not necessary to shift the burden of proof, but that, if a petitioner, in a single, non-bifurcated proceeding, produces evidence sufficient to preclude a finding that the Plan complies as a matter of law, that constitutes sufficient "compelling evidence" to require the State to establish compliance. The ultimate burden should not depend on whether the proceeding is bifurcated.

- 11 -

/3a

caption, should be treated as a timely petition under Article III, § 5 of the Maryland Constitution. He states several reasons why the Enacted Plan is in violation of the Federal Constitution, all of which stem from his argument that the bicameral scheme created for the Legislative Branch of the Federal Government by the U.S. Constitution is applicable as well to the States.

In his petition, Mr. Bouchat notes that Article I, §§ 2 and 3 of the U.S. Constitution provide for a House of Representatives that is to be apportioned among the States according to population, subject to each State having at least one Representative, and a Senate to consist of two Senators from each State. He asserts that, by implicit Federal mandate, State Legislatures must have a similar structure, which, in his view, would require that (i) each county have at least one Delegate in the House of Delegates, (ii) the Senate consist of two Senators from each county, and (iii) multi-member districts or districts that cross county lines are not permissible. His request for relief is that the Court:

(1) Declare Article III, § 3 of the Maryland Constitution, which permits the creation of multi-member House of Delegates subdistricts, null and void;

(2) Require that each county and Baltimore City have two Senators, which implicitly would render Article III, § 2 of the Maryland Constitution null and void;

(3) Require that all Delegates be elected from single-member districts;

(4) Prohibit House of Delegate subdistricts from crossing county lines; and

- 12 -

*14*a

(5) Require that each county be entitled to one Delegate and that all other Delegate seats be apportioned according to population.

In seeking this relief, Mr. Bouchat relies not only on the text of Article I, §§ 2 and 3 of the U.S. Constitution, but on excerpts from some of the *Federalist* papers, the Privileges and Immunities Clause of the Fourteenth Amendment, and the guarantee in Article 4, § 4 of the U.S. Constitution that each State have a republican form of government. In his pre-trial memorandum, he cites Article II, § 1 and the Ninth and Tenth Amendments as well.

### The State's Response

The State moved to dismiss Mr. Bouchat's petition preliminarily, without the need for evidentiary hearings, on the ground that the legal theories asserted by him fail to state a valid claim, as a matter of law. Acknowledging that there are no specific Rules allowing motions to dismiss or for summary judgment in redistricting cases, in which the Court exercises original jurisdiction, the State construes selected language from *Matter of Legislative Districting, supra,* 370 Md. at 322 and 336, n.17, 805 A.2d at 297-98 and 306, n.17, as permitting the Court to dismiss a petition summarily.

Although the language cited by the State is taken somewhat out of context, it is unimportant in this case whether the Court *could* have dismissed Mr. Bouchat's petition summarily, because it has not done so. Evidentiary hearings have been held in which Mr.

- 13 -

/5a

Bouchat participated. His petition and the State's response will be treated on their merits in this Report.

## **Analysis and Recommendation**

Mr. Bouchat's first argument, that the structure of Congress directed in Article I, §§ 2 and 3 of the U.S. Constitution is a required template for the States, is without merit. The text of those provisions, by their clear wording, apply only to the structure of Congress and do not purport in any way to control the structure of State legislatures, much less to require a State legislative apportionment that would produce significant population disparities or to require single-member districts that do not cross county lines. Apart from the lack of any such textual requirement, the Supreme Court, in *Reynolds v. Sims, supra*, 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed.2d 506 expressly rejected "the applicability of the so-called federal analogy to state legislative apportionment arrangements," holding that "the Founding Fathers clearly had no intention of establishing a pattern or model for the apportionment of seats in state legislatures when the system of representation in the Federal Congress was adopted." *Id.* at 572-73, 84 S. Ct. at 1387, 12 L.Ed.2d at 534-35.[7]

_____

[7] The thrust of the Court's rationale was that the structure of Congress and the provision of two Senators from each State was a political compromise among the original 13 States which, at the time, were sovereign political entities that banded together to form the Federal Government. That is not the case, however, with respect to the political subdivisions of a State. None of them ever were sovereign political entities that banded

Nor does the guaranty of a republican form of government in Article IV, § 4 of the U.S. Constitution create a Federal Constitutional basis for judicial relief. *See Baker v. Carr*, 369 U.S. 186, 218-24, 82 S. Ct. 691, 710-13, 7 L. Ed.2d 663, 686-89 (1962), where the Supreme Court flatly rejected Article IV, § 4 as a basis for judicial review of a State's legislative apportionment plan. *See* also *New York v. United States*, 505 U.S. 144, 184, 112 S. Ct. 2408, 2432, 120 L. Ed.2d 120, 155 (1992).

The Federal Constitutional constraints on State legislative districting are those arising from the Equal Protection Clause of the Fourteenth Amendment, the principal one being the "one person/one vote" requirement announced in *Reynolds v. Sims,* under which, as this Court iterated in *Matter of Legislative Districting, supra*, 370 Md. at 325, 805 A.2d at 299, "the states are required to apportion *both* houses of their legislatures on an equal population basis, to assure that one citizen's vote is approximately equal in weight to that of every other citizen." (Emphasis added).

In light of the State's current demographic distribution, the supervening Constitutional requirement of substantially equal population in both Senate Districts and Delegate Subdistricts absolutely precludes an apportionment scheme under which each county would be entitled to two (or any other equal number of) Senators. Under such a scheme, Kent County, with an adjusted population of 20,266, and Montgomery County,

---

together to form the State. *See Reynolds, supra*, 377 U.S. at 573-74, 84 S. Ct. at 1387-88, 12 L. Ed.2d at 533-34.

- 15 -

*17a*

with an adjusted population of 972,338, would each be entitled to two Senators, giving

each resident in Kent County 48 times the voting strength of a resident of Montgomery

County. A similar scheme was expressly rejected in *Reynolds v. Sims,* and as well in the

companion case of *Maryland Committee for Fair Representation v. Tawes, supra,* 377

U.S. 656, 84 S. Ct. 1429, 12 L. Ed.2d 595.[8]

Unless the size of the House of Delegates were to be expanded five to ten-fold,

any requirement that each county be entitled to one Delegate would be doomed for the

same reason. *See Maryland Committee, supra.* As Article III, §§ 2 and 3 of the Maryland

Constitution provide for 141 members of the House of Delegates, to be elected from 47

Legislative Districts, three from each district, and as there is no Federal Constitutional

impediment to that provision, the apportionment of the House of Delegates on any basis

other than substantial equality of population is impermissible.

Finally, in his petition, Mr. Bouchat contends that multi-member Delegate

districts are prohibited under Federal Constitutional law and that, to the extent they may

be permitted, they may not cross county lines. Multi-member districts, he avers, "institute

voting inequality upon the populous," and combining parts of two or more counties in a

---

[8] The *Reynolds* Court held that an apportionment plan for Alabama that accorded
each of the State's 67 counties a minimum of one Senator, which created a disparity
between the most populous and least populous county of 41 to 1, was invalid under the
Equal Protection Clause. In *Maryland Committee*, the Court likewise struck down
Maryland's apportionment of its 29-member Senate of one Senator for each of the State's
23 counties and six for Baltimore City, which created a population disparity between the
most and least populous subdivisions of 32 to 1.

/8a

single district "caus[es] a minority county section to be dis-enfranchised by the majority county portion of a district." He offers no facts to show that any particular multi-member or multi-county district has produced that effect, however, other than noting generally that since the Civil War, with limited exceptions, the Democratic Party has controlled the House of Delegates.

The Supreme Court, on a number of occasions, has expressed concern over certain undesirable features of multi-member districts, especially as they may dilute the ability of racial or ethnic minorities in such districts to elect members of their group to legislative office. So far, however, the Court has made clear that such a district is not *per se* unlawful under the Equal Protection Clause. The clearest expression of the Court's view is in *Whitcomb v. Chavis*, 403 U.S. 124, 142-43, 91 S. Ct. 1858, 1868-69, 29 L. Ed.2d 363, 375-76 (1971):

> "In *Lucas v. Colorado General Assembly*, 377 U.S. 713 (1964), decided with *Reynolds v. Sims*, we noted certain undesirable features of the multi-member district but expressly withheld any intimation 'that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective." 377 U.S., at 731, n.21. Subsequently, when the validity of the multi-member district, as such, was squarely presented, we held that such a district is not *per se* illegal under the Equal Protection Clause. [citations omitted]. That voters in multi-member districts vote for and are represented by more legislators than voters in single-member districts has so far not demonstrated an invidious discrimination against the latter. But we have deemed the validity of multi-member district systems justiciable, recognizing also that they may be subject to challenge where

*199*

> the circumstances of a particular case may 'operate to
> minimize or cancel out the voting strength of racial or
> political elements of the voting population.
>
>         *     *     *     *
>
> [W]e have insisted that the challenger carry the burden of
> proving that multi-member districts unconstitutionally operate
> to dilute or cancel the voting strength of racial or political
> elements."

*See* also *Thornburg v. Gingles,* 478 U.S. 30, 48, 106 S. Ct. 2752, 2765, 92 L. Ed.2d 25,

45 (1986); *In re Legislative Redistricting, supra,* 299 Md. at 673, 475 A.2d at 435;

*Legislative Redistricting Cases, supra,* 331 Md. at 606, 629 A.2d at 662.[9]

     The additional references in Mr. Bouchat's pre-hearing memorandum to Article I,

§ 1 of the Federal Constitution (the method of electing the President) and the Ninth and

Tenth Amendments are to no avail. He does not explain how the Enacted Plan violates

any of those provisions, and none are apparent.

     As Mr. Bouchat, who has the burden of production and persuasion on this issue,

has failed to show that any multi-member district provided for in the Enacted Plan would

have the effect of diluting or canceling the voting strength of any racial or political

---

[9] When dealing with Congressional districts, Congress has an independent measure of oversight over the use of multi-member districts. Article I, § 4 of the U.S. Constitution provides that the times, places, and manner of holding elections for Senators and Representatives shall be prescribed by the State Legislatures "but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [*sic*] Senators." Congress has enacted legislation and, with some exceptions, precluded multi-member districts. *See League of United Latin American Citizens v. Perry,* 548 U.S. 399, 415, 126 S. Ct. 2594, 2608, 165 L. Ed.2d 609, 629 (2006) (*LULAC*). The basis of that regulation – Article I, § 4 – does not apply to State Legislatures, however.

element, he has failed to make a case for declaring any such district unlawful. With respect to the complaint about a multi-member district including parts of more than one county, there is no Federal prohibition against such a district, but is more a matter of compliance with the requirement in Article III, § 4 of the Maryland Constitution that, in the creation of any district or subdistrict, due regard be given to natural and political boundaries. As the Court has made clear, however, if a multi-county district or subdistrict is created in order to gratify some supervening requirement – equivalent population, compliance with the Voting Rights Act – then the "due regard" requirement may be regarded as either yielding or complied with. It is "the most fluid of the constitutional components outlined in § 4." *In re Legislative Districting, supra*, 299 Md. at 681, 475 A.2d at 439.

    **For these reasons, it is recommended that Mr. Bouchat's petition be denied.**

## MISCELLANEOUS NO. 3
### PETITION OF DELORES KELLEY AND JAMES BROCHIN

#### Background

    Petitioners Kelley and Brochin, in addition to being registered voters in Baltimore County, are incumbent members of the Maryland Senate from that county. Senator Kelley represents District 10 (as it existed under the 2002 Plan); Senator Brochin represents District 42 (as it existed under the 2002 Plan). Their complaint arises principally from the reconfiguration of those two districts and Legislative District 44 in

- 19 -

the Enacted Plan.

Under the 1992 redistricting plan, there were 18 multi-county Legislative Districts Statewide, five more than existed under the 1982 plan.   Baltimore County was involved in seven of them, five shared with Baltimore City and one each shared with Harford County and Howard County.  Although the Court sustained the plan against a "due regard" challenge under Article III, § 4 of the Maryland Constitution, the Court warned that the plan came "perilously close" to violating that provision.

That warning largely was ignored in the development of the Governor's 2002 redistricting plan.  Under that plan, the number of multi-county Senate Districts increased to 22 Statewide, nine of which involved Baltimore County – five districts shared with Baltimore City and one each with Harford, Howard, Anne Arundel, and Carroll County. The Court found that the invasions of county boundaries, throughout the State, were not necessary in order to comply with Federal requirements and that due regard had not been given to natural or political boundaries.  The Court declared the plan to be invalid.

Due to the imminence of the 2002 quadrennial election for legislative seats, there was no time to commit the plan for correction by the General Assembly, and the Court was required to draw and put into effect its own districting plan – one, as it explained, that conformed to all Federal and State Constitutional requirements but paid no homage to the kind of political considerations that may have been permissible had a proper plan been devised by the Governor or General Assembly. *See Matter of Legislative*

- 20 -

22a

*Redistricting, supra*, 370 M d. at 323, 805 A.2d at 298.

The Court's plan reduced the number of shared Senate Districts Statewide from 22 under the Governor's 2002 plan to 14, all of which were required to achieve substantial population equality, and eliminated all shared districts between Baltimore County and Baltimore City. Baltimore County, which had a 2000 population of 754,292, had five Senate Districts wholly within the county (Districts 6, 8, 10, 11, and 42) and shared one each with Carroll County (District 5), Harford County (District 7), and Howard County (District 9). Baltimore City, with a 2000 population of 651,154, had six Senate Districts (Districts 40, 41, 43, 44, 45, and 46) all entirely within the City. *See* **Joint Exhibit 1** (Maryland 2002 Legislative Districts).

## The Complaint

The principal focus of the Kelley/Brochin petition is on the reconfiguration of Legislative Districts 10, 42, and 44 in the Enacted Plan, which they claim violates the "due regard" provisions of Article III, § 4. Under the Court's 2002 plan, District 44 comprised the southwestern part of the City and was compact. District 10, which was entirely within the county, abutted part of the western border of the City (District 41). District 42, also entirely within the county and compact in form, abutted the northern border of Baltimore City and extended northward about a third of the way to the Pennsylvania line. *See* **Joint Exhibit 1.**

- 21 -

23a

During the decade between 2000 and 2010, the population of Baltimore City declined from 651,154 to 624,064, while the population of Baltimore County increased from 754,292 to 807,053. Assuming an "ideal" district of 122,813 people, if the political subdivision boundaries were completely respected, Baltimore City should contain 5.1 Senate Districts and Baltimore County should contain 6.5 Senate Districts. The Enacted Plan, however, by reconfiguring the districts in both the City and the county, kept five Senate Districts (40, 41, 43. 45, and 46) entirely within the City but extended Senate District 44 into the county and split that district into two Delegate Subdistricts, one entirely within the City and one in the county. The City part (Subdistrict 44A), from which one Delegate is elected, runs in a relatively thin and lumpy line from just west of the center of the City in a southwesterly direction to the western/southwestern border of the City. The County part (Subdistrict 44B), from which two Delegates are elected, is roughly "J" shaped. The vertical leg, rectangular in shape, runs on a north/south axis along most of the western border of the City and extends in width to the Baltimore Beltway (I 695); the other part – the "hooked" part of the "J" – runs from the Beltway in a west/northwest direction, extending nearly to Catonsville in the south and to Patapsco State Park in the west. *See* **Joint Exhibits 1A, 2,and 3.**

Subdistrict 44B occupies much of the territory that, under the Court's 2002 plan, was within District 10. The effect of that is to move District 10 to the west and north, so it no longer has a contiguous border with Baltimore City and extends to the Carroll County

- 22 -

*24a*

line. As a result, the District contains a different mix of ethnic populations. In order to accommodate the extension into the county of District 44, District 42 also was reconfigured. It was shrunk in width and split into two subdistricts, one being a single-member Delegate Subdistrict small in area that abuts part of the northern border of the City, and the other, a two-Delegate Subdistrict, that extends in a north/northwest direction all the way to the Pennsylvania line.

Keying on their claim that the population of Baltimore City justifies no more than five Legislative Districts, all of which could be contained entirely within the City, whereas the population of Baltimore County justifies at least six Legislative Districts within the county, Senators Kelley and Brochin assert that:

(1) the extension of District 44 into Baltimore County was wholly unnecessary to achieve either population equality or voting rights protection for any racial or ethnic minority, and, for that reason, violates the "due regard" requirement; and

(2) the effect of that extension is unnecessarily to underpopulate the districts in the City, though not by more than 5%, to make it likely that Baltimore City will be able to elect six Senators rather than five, and to make Districts 10, 24, and 44 much less compact than they were under the Court's 2002 plan and that they need to be. They cite a news article in which Senate President Miller is quoted as saying that the Governor drew the Districts as he did in order "to keep six senators in Baltimore City."

The petitioners did not formally offer an alternative plan, other than to propose that

25a

consideration be given to a plan for redistricting Baltimore City into five Senate Districts (40, 41, 43, 44, and 45), all within the boundaries of the City, that was proposed to GRAC by the Fannie Lou Hamer PAC, a map of which is attached as Exhibit 7 to the petition. As relief, they ask that the Court (1) hold that the provisions of the Enacted Plan "as they relate to Baltimore City and Baltimore County are unconstitutional as being in violation of the 'due regard' provisions of Md. Const., Art. III, § 4," and (2) "draw a new map of Baltimore City, Baltimore County and such other areas of the state as are necessary to create a plan consistent with the constitutional mandate," and (3) provide such other relief as the nature of their cause may require.

## The State's Response

The State responded, as it did to the other petitions, with a motion to dismiss or for summary judgment. That motion was not ruled upon by the Court, so this Report will consider the merits of the petition and response.

Stressing this Court's observation in its earlier redistricting decisions that the "due regard" provision of Article III, § 4 is the "most fluid" of the Constitutional requirements, the State considers the "due regard" issue in three contexts. Its preferred approach, which it characterizes as a "holistic" one, considers the Enacted Plan as a whole and determines whether there is a violation of the requirement based on the number of shared Legislative Districts Statewide, with little regard to any particular incursion into a county. A second

- 24 -

26a

approach looks at incursions into a particular county, but, somewhat like its "holistic" approach, determines whether due regard was given based on the number of incursions, rather than whether any particular one was required to gratify a supervening Federal requirement. Its third approach views the requirement in a political context.

As to the "holistic" approach, the State contends that looking just at an incursion from one county into another "cannot be the test for whether the State's Redistricting Plan as a whole, with its 47 Senate districts and 141 House districts, complies with the due regard provision." It construes the Court's "due regard" jurisprudence as looking at a redistricting plan "holistically and Statewide – not by focusing solely on a single county." Pursuing that approach, the State observes that, because the Enacted Plan contains only 13 shared Legislative Districts Statewide -- one less than the 2002 plan devised by the Court – there is no violation of the due regard requirement. Under this view, whether the extension of Legislative District 44 into Baltimore County was or was not necessary to gratify some higher Constitutional mandate would be largely irrelevant, for, even if the incursion was not necessary, it would not invalidate the plan.

The second approach appears to extend something akin to the "holistic" notion specifically to the Baltimore County/Baltimore City situation. In the Court's 2002 plan, Baltimore County had three shared Senate Districts – one with Howard County, one with Harford County, and one with Carroll County. Under the Enacted Plan, it still has three shared Senate Districts – one each with Howard County, Harford County, and Baltimore

- 25 -

27a

City. The gross number has not changed. Since there were no additional incursions, there

is, in the State's view, no violation.

That point provides a feed-in to the State's political argument. As to that, the State

begins with the premise that shared districts are sometimes necessary to implement Federal

requirements – a fact necessarily conceded by the petitioners – but adds to that the

argument that the choice of *where* those necessary incursions are made is a political

decision to be made by the Legislature, to which the Court should defer. Citing a passage

from the Court's 2002 redistricting opinion, it contends that the Court itself has recognized

that it is "not for the Court to determine which regions deserve special consideration and

which do not."[10]   Noting that the Enacted Plan eliminates the shared district between

Baltimore County and Carroll County that was part of the Court's 2002 plan, the State

---

[10] In *Matter of Legislative Districting, supra*, 370 Md. at 321-23, 805 A.2d at 297-98, the Court pointed out that, when the Governor and the Legislature draw a districting plan, they may consider "countless other factors [other than the Constitutionally required ones], including broad political and narrow partisan ones, and they may pursue a wide range of objectives" including the preservation of communities of interest, but that when, as in that case, it is necessary for the Court to draw the plan, it may not take those political objectives into account. It was in that context that the Court added the statement, "More basic, it is not for the Court to define what a community of interest is and where the boundaries are, and it is not for the Court to determine which regions deserve special consideration and which do not." The Court made abundantly clear, however – indeed it was the fundamental holding in the case – that, although the Governor and the Legislature may *consider* a broad range of non-Constitutional factors, such as preserving communities of interest, it may not ignore the Constitutional requirements, including compactness and due regard for political and natural boundaries, in order to achieve those broader objectives, and if the Court concludes that they improperly have done so, the Court will declare the plan invalid.

28a

iterates that there has been no *additional* incursion into Baltimore County but merely a *different* one.

One of the reasons for the extension of District 44, the State argues, "is the desire of the State – consistent with, if not compelled by, the Voting Rights Act – to ensure that the number of Senatorial Districts in the Baltimore Metropolitan region in which African American citizens constitute a majority and are able to elect the representative of their choice does not diminish in comparison with the 2002 plan."[11] The extension of Senate District 44, the State continues, "achieves this goal by uniting adjacent African American neighborhoods across the Baltimore City/Baltimore County border" and "properly reflects the priority of federal over state redistricting criteria." In making that argument, the State relies on the opinion of its expert, Bruce E. Cain, a Professor of Political Science at the University of California Berkeley, who, in maintaining that the Enacted Plan meets the letter and spirit of the Voting Rights Act, opined in his June 5, 2012 Declaration:

> "The new 44th District, for instance, maintains African-American representation in the face of population decline in Baltimore City by uniting African-American adjacent neighborhoods across the city/county border. Petitioners Delores Kelley and James Brochin argue that this district violated the state requirement of due regard for jurisdictional boundaries when it drew Legislative District 44. But it is very clear that the State's intent was to ensure fairness and greater representation to the African-American population by uniting

_____

[11] The State has not contended, and has offered no evidence to suggest, that the elimination of District 44 as urged by the petitioners *would* constitute or result in a violation of the Voting Rights Act.

$29a$

> adjoining African-American neighborhoods in Baltimore City
> and Baltimore County. This properly reflects the priority of
> federal over state redistricting criteria."

Cain Declaration, June 5, 2012, ¶ 14.[12]

The State also alludes to statements in GRAC's recommendation – that "District 44 becomes a one-member district in the City, with a two-member, majority African American district in Baltimore County, reflecting population shifts and preserving African American representation in the region."

## **Analysis and Recommendation**

The petitioners are correct that the adjusted 2010 population of Baltimore City would entitle the City to five Senate Districts, all of which could be located entirely within the City boundaries. There may be several ways of achieving that result, but all would obviously entail reconfiguring the boundaries of the Legislative Districts in the City. All five of the Senate Districts located entirely in the City under the Enacted Plan are underpopulated, as is Subdistrict District 44A.[13]  The result of a reconfiguration of the

---

[12] Professor Cain filed two Declarations, one dated June 5, 2012 that was attached to the State's Motion to Dismiss, and another dated July 13, 2012 that was attached to the State's Pre-Trial Memorandum and was in the nature of a rebuttal to the Declaration of Professor Hood, the expert retained by the Houser petitioners in Misc. No. 5.

[13] Dividing the City's adjusted population of 624,064 by five would produce Senate Districts each containing 124,813 people, which is 1.6% greater than an "ideal" Senate District of 122,813. In order to retain the extra Delegate Subdistrict 44A in the City, all five of the other Legislative Districts in the City under the Enacted Plan are underpopulated by a significantly greater percentage. Senate District 40 is

- 28 -

30a

Legislative Districts in the City – the elimination of Subdistrict 44A in the City – would require additional redistricting in Baltimore County as well. Except for the Hamer PAC Plan attached as Exhibit 7 to the petition, neither side has presented an alternate plan to show how that might be done.

It is true that the "due regard" requirement is the "most fluid" of the various requirements, because, to gratify the Federal mandates of population equality and the protection of voting rights, it is sometimes necessary to join parts of different counties or municipal entities in a district, or to have a district cross natural boundaries. As the Court made clear in its most recent redistricting case, *Matter of Legislative Districting, supra*, 370 Md. at 370, 805 A.2d at 326, however, the requirements of Article III, § 4 are not "secondary requirements." They may "necessarily yield to federal requirements" but they "are nonetheless mandatory." *Id.*

Contrary to the State's belief, its "holistic" argument finds no support whatever in the Court's redistricting jurisprudence. It is true that in the 2002 decision, the Court did comment on the number of incursions throughout the State, noting that the Governor's plan then before it had increased the number of shared Legislative Districts from 18 to 22 and concluding that there was an excessive number of political subdivision crossings that

---

underpopulated by 4.49%; Senate District 41 is underpopulated by 4.52%; Senate District 43 is underpopulated by 4.63%; Senate District 45 is underpopulated by 4.62%; and Senate District 46 is underpopulated by 4.37%. Senate District 44 is underpopulated by 3.51%.

31a

could not be justified. The Court was responding to the fact that there were 14 petitions filed in that case raising "due regard" issues with respect to Legislative Districts in every part of the State. The Court examined each challenge individually, however, and it found violations on an individual basis.

The gross number of incursions Statewide, standing alone, would have been meaningless had the State been able to show that each of the individual incursions was necessary to achieve population equality or to avoid a violation of the Voting Rights Act. The whole plan was struck down because that showing had not been made – the individual incursions were impermissible and were so pervasive and inter-connected that it was impossible to correct them in a piecemeal surgical fashion. There is nothing in that decision, or any other, supporting the argument that one unjustified incursion should, or must, be overlooked simply because there were fewer total incursions than in the previous plan.

Apart from the lack of any affirmative precedential support, the "holistic" argument ignores the purpose of the "due regard" requirement. In its 1982 redistricting decision, *In re Legislative Districting, supra*, 299 Md. at 681, 475 A.2d at 439, the Court concluded that the primary intent of the "due regard" requirement was "to preserve those fixed and known features which enable voters to maintain an orientation to their own territorial areas." In its 2002 decision, the Court gave greater elaboration to the importance of counties in the apportionment of seats in the General Assembly. Quoting from and

- 30 -

32a

adopting views expressed by Judge Eldridge in his dissent from the 1992 decision

(*Legislative Redistricting Cases, supra*, 331 Md. at 621, 629 A.2d at 670), the Court noted

that "[t]he counties in Maryland occupy a far more important position than do similar

political divisions in many other states of the union," that "[a]fter the State as a whole, the

counties are the basic governing units in our political system," and that "prior legislative

redistricting plans, 1992 being the exception, considered the counties and Baltimore City

'the primary element in apportionment,' only crossing subdivision lines to achieve

population equality.'" *Matter of Legislative Redistricting, supra*, 370 Md. at 359, 368, 805

A.2d at 319-20, 325.[14]

    Just as it is inappropriate to consider "due regard" as not having been given to

natural or political boundaries merely because there is a crossing or incursion, it is equally

inappropriate to ignore an unnecessary incursion in one place merely because there are

fewer incursions elsewhere.  As noted, upon the presentation of compelling evidence

tending to indicate an unnecessary incursion, the State has the burden of showing

compliance with the "due regard" requirement with respect to that incursion.  That is true

as well with respect to the State's secondary numerical argument – that there is no "due

regard" violation because the gross number of incursions into Baltimore County has not

---

[14] The conclusion that incursions were allowed only to achieve population equality
was correct in decisions prior to the enactment of the Voting Rights Act of 1965.  The
Court has since made clear that incursions necessary to avoid a violation of that Act are
also, not just permissible, but necessary.

increased. There, too, the appropriate question is whether a properly challenged incursion can be justified as necessary or helpful in achieving a supervening, or at least equally important, requirement. If so, there is no violation because due regard *was* given to the natural or political boundary. If not, the incursion is improper, regardless of the number of incursions elsewhere.

The number and location of crossings do have significance, however, in the context of population equality. If a county's population will not justify an additional Legislative District wholly within the county but does entitle it to representation beyond what otherwise is provided, a crossing will be necessary, and the question becomes where that crossing should occur. Except to the extent constrained by supervening requirements, the State's argument that *that* decision is essentially a political one to which the Court should defer has merit. In its 2002 decision, the Court observed:

> "To be sure, it is the responsibility of the Governor, initially,
> and the Legislature ultimately, if it chooses to act, to draw the
> legislative districts. Fulfillment of that responsibility involves
> the exercise of discretion in balancing of the various
> constitutional requirements, as well as other considerations, to
> the extent they do not undermine the requirements. And
> because the process is partly a political one, entrusted to the
> political branches, political considerations and judgments may
> be, and often are, brought to bear as this balance is struck.
> Such considerations and judgments, as reflected in a districting
> plan that meets constitutional muster, will not be, indeed,
> cannot be, second guessed by the Court.

*Matter of Legislative Districting, supra*, 370 Md. at 369, 805 A.2d at 326.

The fact that a Baltimore City/Baltimore County crossing is not necessary to

- 32 -

3 9 a

achieve population equality in Baltimore *City* is only one factor. The other concerns the population of Baltimore *County*. As noted, the adjusted 2010 population of the county is 807,853, which would permit 6.5 "ideal" Legislative Districts in the county. Even six districts containing five percent more than the "ideal" 122,113 (769,306) would not suffice; the county would still need to have part of its population – more than 38,000 people – in one or more districts shared with another county.[15] Petitioners do not dispute that fact but contend that, either as a matter of law or something close to it, preference should be given to avoiding an incursion with a major subdivision like Baltimore City and thus to looking elsewhere to make the crossing.

The Governor and, by acquiescence, the General Assembly chose to have the necessary crossing with Baltimore City, apparently in order to preserve a community of interest of the African-American population that straddles the City/County line. The petitioners offered no evidence to show that was not at least one intent or that the extension of District 44 into the county would not, in fact, preserve such a community of interest. As the Court made clear in its 1992 and 2002 redistricting decisions, although the preservation of communities of interest cannot take precedence over Constitutional requirements, it is a legitimate political goal and properly can serve as a reason to achieve population equality through the creation of a shared Legislative District with Baltimore City, rather than either an additional or an expanded Legislative District with another

---

[15] 122,113 x 1.05 = 128,218; 128,218 x 6 = 769,306; 807,853 - 769,306 = 38,547.

35a

county. Apart from that, as noted by GRAC, reconfiguration of the Baltimore City/Baltimore County districts served to unite Pikesville in one district and keep Towson together in one subdistrict.

Although a reasonable argument certainly could be made that petitioners' approach would have been "better" in one sense or another, including avoiding underpopulated districts in the City and keeping districts in the City and County more compact, an incursion clearly was necessary and, in the absence of evidence of invidious impermissible racial or political discrimination, the choice of where it was to be made was legitimately a political one properly left to the Governor and General Assembly. Whether the Court treats this as a lack of "compelling evidence" requiring a response from the State or, as the Special Master suggests, an adequate response from the State, due regard was given to the county boundaries.

Although the petitioners, in footnotes 1, 2, and 3 to their petition, observe that the creation of Legislative District 44 has made Legislative Districts 7, 10, and 42 less compact than they were in the Court's 2002 plan, they have not directly alleged a violation of the compactness requirement in Article III, § 4. The clear thrust of their complaint, both in their petition and in their pre-hearing statement, is the alleged violation of the "due regard" requirement.

**For the reasons noted, it is recommended that the petition in Misc. No. 3 be denied.**

- 34 -

36a

MISCELLANEOUS NO. 5
PETITION OF CYNTHIA HOUSER, *et al.*

### The Complaint

The petition in Misc. No. 5 is on behalf of 22 registered voters from 12 Legislative

Districts comprising, respectively, parts of Frederick, Carroll, Howard, Baltimore, Prince

George's, Calvert, Charles, Kent, Queen Anne's, and Caroline Counties. The petitioners

claim that the Enacted Plan violates the Equal Protection Clause of the Fourteenth

Amendment, equal protection principles embodied in Article 24 of the Maryland

Declarations of Rights, the compactness and "due regard" requirements of Article III, § 4

of the Maryland Constitution, and Section 2 of the Voting Rights Act of 1965.

The major thrust of the petition is that the Enacted Plan is the product of

impermissible racial and political gerrymandering. Relying to a large extent upon the

holdings of the three-judge U.S. District Court in *Larios v. Cox, supra,* 300 F. Supp.2d

1320, affirmed by the Supreme Court without opinion in *Cox v. Larios,* 542 U.S. 947, 124

S. Ct. 2806, 159 L. Ed.2d 831, the petitioners allege that the Enacted Plan's maximum and

average deviations violate the "one person, one vote" principle because they are

unnecessarily large and embody discrimination based on race, partisanship, rates of

population growth, and region.

That kind of discrimination, they urge, contravenes pronouncements in several

Supreme Court cases, including *Reynolds v. Sims, supra* and the companion case of

*Roman v. Sinock,* 377 U.S. 695, 84 S. Ct. 1449, 12 L. Ed.2d 620 (1964). They add that,

- 35 -

37a

under both the Federal and State equal protection umbrella, the Enacted Plan is invalid because (1) its intent was to punish Republicans and reward Democrats, (2) it was designed to allow areas of the State with the slowest growth to maintain their hold on power, (3) it discriminates against persons in the rural areas of the State by overpopulating districts in those areas and underpopulating districts in the urban areas, and (4) it is racially discriminatory by underpopulating nearly all African-American districts. They note in that last regard that, of the 37 majority African-American Delegate Districts, 30 are underpopulated and, of the 30, 28 are underpopulated by more than 4% and 25 by 4.49% or more.

The argument under the Voting Rights Act is that African-Americans constitute 29.3% of the State's population, that proportionality suggests that African-Americans should have at least 41 of the 141 seats in the House of Delegates and 13 or 14 Senate seats, but that the Enacted Plan allocates only 37 seats to majority African-American Delegate Districts and only 12 seats to majority African-American Senate Districts. The Enacted Plan, they contend, was enacted with invidious discriminatory intent and does not afford the petitioners an equal opportunity to participate in the political process and elect representatives of their choice. As part of both the Voting Rights Act complaint and the complaint based on Article III, § 4 of the Maryland Constitution, they allege that the Enacted Plan contains 17 Senate Districts and 32 Delegate Subdistricts that are split between county lines for reasons unrelated to compliance with supervening Federal or

38a

Maryland Constitutional requirements and that the districts are not compact in form.

As relief, the petitioners ask that the Enacted Plan be declared invalid, that the Court adopt either the alternative plan that had been introduced into the House of Delegates by Delegates Hough and Alston attached as Exhibit C to the petition (**Houser Exhibits 5 and 6**) or a "Coherent County Map" that they devised and attached as Exhibit D to the petition (**Houser Exhibits 3 and 4**), and that attorneys' fees be awarded pursuant to 42 U.S.C. § 1983 (more appropriately § 1988).

## The State's Response

The State's response, similar to those filed with regard to the other petitions, was in the form of a motion to dismiss or for summary judgment. That motion was not ruled upon by the Court, so this Report will consider the merits of the petition and the response.

The State makes a twofold law-based response to the petitioners' equal protection argument – that Article 24 of the Declaration of Rights has never been construed to impose a population equality requirement with respect to legislative districting, and that population variances between the most and least populous districts of less than 10% do not give rise to a population equality claim under either Federal or Maryland law. Other than to note that there are no decisions of the Court of Appeals holding that Article 24 *does* impose a population equality requirement, the State's position is that the only source of a population equality requirement under State law is Article III, § 4 of the Constitution and

- 37 -

*39a*

that the petition "does not allege that the Enacted Plan violates the 'substantially equal population' requirement of Article III, § 4."[16]

The State denies that there was any deliberate or intentional discrimination in the Enacted Plan. It contends that the district lines and resulting population deviations are all justified by legitimate considerations and avers that the alternative plans offered by petitioners, though containing fewer county crossings and lower population deviations, are significantly deficient in other relevant regards.

With respect to the Federal equal protection complaint, the State cites and relies on the Court's pronouncement in the 1993 redistricting case that "if the State's plan 'has a maximum deviation from population equality of less than 10%' separating the most populous district from the least populous, then 'under the plain language of the Supreme Court's rulings, it satisfies the federal constitutional requirement of one person, one vote.'" *Legislative Redistricting Cases, supra,* 331 Md. at 594-95, 629 A.2d at 656.

The State dismisses the Supreme Court's 2004 summary affirmance in *Cox v. Larios* as of no consequence, citing *Mandel v. Bradley,* 432 U.S. 173, 176, 978 S. Ct. 2238. 2240, 53 L. Ed.2d 199-204-05 (1977) for the propositions that "a summary affirmance is an affirmance of the judgment only" and "not necessarily the reasoning by

---

[16] Although a violation of the equal population provision in Article III, § 4 is not included among the "Claims" stated in section VI of the petition, ¶ 2.c. of section I of the petition does allege that the Enacted Plan is in violation of Article III, § 4 in that it "is not compact in form, nor does it contain substantially equal population . . ."

40 a

which it was reached" and that "[a]n unexplicated summary affirmance . . . is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument." It adds that, even if *Larios* were regarded as precedential, the facts pled by petitioners fall far short of the those in *Larios*, which the State views as *sui generis*.

The State's response to the Voting Rights Act complaint also is multi-faceted. It points out, first, that the statute, by its own terms, does not confer a right to have members of a protected class elected in numbers equal to their proportion in the population.[17] It adds that § 2 of the Act does not obligate the States to create the maximum possible number of majority-minority districts, and that attempts by States to do so have been found to be evidence of intentional racial discrimination. The State thus rejects the contention that, because African-Americans make up 29.3% of the State population, they are entitled to 41 Delegate Districts and 13 or 14 Legislative (Senatorial) Districts.

Relying on a line of Supreme Court cases commencing with *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed.2d 25 (1986), the State argues that, in order to establish a § 2 violation, the petitioners must first satisfy three threshold conditions: (1) that the racial group is sufficiently large and geographically compact, (2) that the group is

---

[17] As noted, 42 U.S.C. § 1973(b) provides that a violation is established if it is shown that "members of a protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" but that nothing in that section "establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

4/9

politically cohesive, and (3) that the majority votes sufficiently as a bloc to enable it

usually to defeat the minority's preferred candidate. If all three of those factors are

established, the Court must then consider the totality of the circumstances to determine

whether members of the racial group have less opportunity than do other members of the

electorate to elect representatives of their choice. The State contends that the petitioners

have failed to establish the threshold criteria, and that, in any event, they have no standing

to challenge the Enacted Plan as a whole under § 2 but may raise a vote dilution claim only

with respect to the particular districts in which they live.

Finally, in response to the petitioners' Fourteenth Amendment claim of racial

gerrymandering, the State contends that, in the absence of any evidence of intentional

discrimination, the petitioners must show that race was the sole, or at least the

predominant, factor in drawing the district lines and that they have failed to do so.


## Analysis and Recommendation

### Equal Protection

The State acknowledges, as it must, that the Federal requirement that districts must

be substantially equal in population emanates from the Equal Protection Clause of the

Fourteenth Amendment and that there is an equivalent requirement contained in Article

III, § 4 of the Maryland Constitution. The petitioners contend that Article 24 of the

Maryland Declaration of Rights also embodies a right of equal protection, equivalent to

- 40 -

42a

the Federal right, which applies to legislative districting as well. The State disagrees,

arguing that Article 24 has never been applied to legislative districting. The State may be

correct that Article 24 has not been applied to legislative redistricting, but likely that is

because it has not previously been raised as a basis for challenging a redistricting plan.

The State cites no Maryland case holding that Article 24 does *not* apply, and this Court's

jurisprudence to the effect that Article 24 generally is regarded as providing rights

equivalent to the Federal clause would seem to require rejection of the State's argument.

*See Murphy v. Edmonds*, 325 Md. 342, 353, 601 A.2d 102, 107 (1992); *Kane v. Board of

Appeals*, 390 Md. 145, 171, n.17, 887 A.2d 1060, 1076 (2005).

As a practical matter, in this case the issue is of no relevance. Unquestionably, both

the Federal right and the population equality provision in Article III, § 4 of the Maryland

Constitution apply, and petitioners do not assert any greater right under Article 24 than is

accorded under those provisions, so whether Article 24 applies or does not apply would

not affect any ruling in this case. There is no reason, in this case, however, to rule that it

does not apply.


### Population Equality – The 10% Rule

The requirement, founded on the Equal Protection Clause of the Fourteenth

Amendment, that both Houses of a bicameral State Legislature be apportioned on a

population basis was first enunciated in *Reynolds v. Sims, supra*, 377 U.S. 533, 568, 84 S.

- 41 -

43a

Ct. 1362, 1385, 12 L. Ed.2d 506, 531. In announcing that requirement, the *Reynolds* Court

recognized that absolute equality was likely an impossibility, and explained that the

requirement meant only that the State must make "an honest and good faith effort to

construct districts . . . as nearly of equal population as is practicable." *Id.* at 577, 84 S. Ct.

at 1390, 12 L. Ed.2d at 536. Rather than lay down a rigid and precise Constitutional

mandate, therefore, the Court observed that some flexibility was permissible in order to

permit the States to pursue other legitimate objectives, such as "maintain[ing] the integrity

of various political subdvisions, insofar as possible, and provid[ing] for compact districts

of contiguous territory . . ." *Id.* at 578, 84 S. Ct. at 1390, 12 L. Ed.2d at 537.[18]

    In a line of cases beginning with *Gaffney v. Cummings*, 412 U.S. 735, 93 S. Ct.

2321, 37 L. Ed.2d 298 (1973) and extending through *Brown v. Thompson*, 462 U.S. 835,

103 S. Ct. 2690, 77 L. Ed.2d 214 (1983) and *Voinovich v. Quilter*, 507 U.S. 146, 1123 S.

Ct. 1149, 122 L. Ed.2d 500 (1993), the Court concluded that:

> "Minor deviations from mathematical equality among state
> legislative districts are insufficient to make out a prima facic
> case of invidious discrimination under the Fourteenth
> Amendment so as to require justification by the State. Our
> decisions have established, *as a general matter*, that an
> apportionment plan with a *maximum population deviation*
> under 10% falls within this category of minor deviations. A
> plan with larger disparities in population, however, creates a

---

[18] In this regard, the Court has allowed some greater flexibility in State legislative districting than in Congressional districting, which is governed by the more stringent provisions of Article I, § 2 of the U.S. Constitution rather than the Equal Protection Clause of the Fourteenth Amendment.

*44q*

>    *prima facie case* of discrimination and therefore must be
>    justified by the State."

*Voinovich,* at 161, 113 S. Ct. at 1159, 122 L. Ed.2d at 516 (Emphasis added).

Three aspects of that pronouncement have been clarified in the cases. The first is that the 10% standard refers to the "maximum population deviation," which means the total deviation from mathematical equality between the most populous district and the least populous district. *See Gaffney, supra*, 412 U.S. at 737, 93 S. Ct. at 2323, 37 L. Ed.2d at 302-03; also *Legislative Redistricting Cases, supra*, 331 Md. at 594, 629 A.2d at 656. As a practical matter, that has led designers of districting plans to try to keep all districts less than 5% above or below the "ideal" number, as that would mathematically preclude there being more than a 10% maximum deviation. There is no dispute here that none of the 47 Senate Districts and none of the Delegate Subdistricts in the Enacted Plan are either underpopulated or overpopulated by as much as 5% and that, as a result, the "maximum population deviation" does not equal, much less exceed, 10%.[19] It is, in fact, 9.41%.

The second clarification, about which there appears to be no dispute, is that a maximum population deviation greater than 10% does not render a plan unconstitutional *per se*, but does constitute a *prima facie* violation and thus requires the State to provide an

---

[19] Although not disputing that the "10% rule" applies to the maximum population deviation, petitioners, in the context of their argument that the "10% rule" is not a safe harbor for the State and that, under *Reynolds* and other cases, the State is obliged to prepare a plan that minimizes population disparities, argue that "average population deviations" are also a relevant factor to be considered.

acceptable reason for the deviation. Deviations in excess of 10% have been found valid by the Supreme Court where the State has presented "a rational state policy" for those particular deviations. *See Brown v. Thompson, supra*, 462 U.S. 835, 103 S. Ct. 2690, 77 L. Ed.2d 214 and *Mahan v. Howell*, 410 U.S. 315, 93 S. Ct. 979, 35 L. Ed.2d 320 (1973). That is not an issue in this case because, as noted, the maximum deviation is less than 10%.

It is the third clarification, triggered to a large extent by the petitioners' reliance on *Cox v. Larios, supra*, that has produced a debate between petitioners and the State. In their petition, petitioners cited *Larios* for the proposition that "when a state legislative redistricting plan contains substantial deviations, even when the deviations are less than 10%, the legislative districting plan can be nullified if the intent of the plan was to discriminate against persons based on region, race, rate of population growth or the protection of one party's incumbents to the detriment of the other party's incumbents."

Citing two brief passages in this Court's 1993 redistricting decision, the State contends otherwise, arguing that, if the maximum disparity is within the 10% range, the State does not have to explain any deviations because the plan complies with equal protection requirements as a matter of law – that 10% does, indeed, constitute a safe harbor for the State. In its 1993 decision, the Court noted that the maximum deviation between the smallest and largest districts was a shade less than 10% and concluded, therefore, that "under the plain language of the Supreme Court's rulings, [the plan]

- 44 -

46 a

satisfies the federal constitutional requirement of one person, one vote" and that the

population disparities "are sufficiently minor so as not to require justification by the

State." *Legislative Redistricting Cases, supra*, 331 Md. at 594-95, 629 A.2d at 656. The

Court did allow the possibility of a petitioner being able to overcome the "10% rule" if

he/she "can present compelling evidence that the drafters of the plan ignored all the

legitimate reasons for population disparities and created deviations *solely* to benefit certain

regions at the expense of others," but, in a footnote, suggested that "[s]uch a showing

would be difficult." *Id*. at 597, 629 A.2d at 657.

In its 2002 decision, the Court did not repeat the 1993 language but simply held that

"[s]ince the State's 2002 Plan is within a ten percent deviation from ideal population

equality, it is entitled to a *prima facie* presumption of constitutionality." *Matter of*

*Legislative Districting, supra*, 370 Md. at 380, 805 A.2d at 332. That appears to be more

in line with what the Supreme Court has consistently said. *See Voinovich v. Quilter,*

*supra*, 507 U.S. at 161, 113 S. Ct. at 1159, 122 L. Ed.2d at 516, quoting and confirming

the pronouncement in *Brown v. Thompson, supra*, 462 U.S. at 842, 103 S. Ct. at 2696, 77

L. Ed.2d at 221-22, that an apportionment plan with a maximum deviation under 10% falls

within the category of minor deviations that "are insufficient to make out a *prima facie*

case of invidious discrimination under the Fourteenth Amendment so as to require

justification by the State." (Emphasis added).

Holding aside the limitations imposed by the Voting Rights Act, the issue

- 45 -

4/7a

presented, for purposes of the one person, one vote requirement, is whether the "10% rule" effectively creates a safe harbor for the State. Petitioners stress the fact that a plan containing a maximum disparity under 10% is only *prima facie* valid, not conclusively so. They note that what the Supreme Court has rejected are arguments that population disparities of under 10% *alone* may render the plan invalid and the fact that this Court, in its 1993 decision, expressly left open the possibility that the "10% rule" could be overcome by evidence of deviations created solely to benefit certain regions at the expense of others, which would be inconsistent with any notion of conclusive validity. They view the "10% rule" as merely a "burden shifting mechanism" – if the disparity is less than 10%, the petitioners must overcome the presumption of validity but are free to do so if they can; if the disparity is 10% or greater, the State must overcome the presumption of invalidity, and, unless the disparity exceeds an amount not yet clearly determined, it is free to do so if it can.

Even without regard to *Larios*, petitioners' view appears to be the correct one. The Supreme Court has never held that a plan with less than 10% maximum disparity is *conclusively* valid under the equal population requirement. *See Moore v. Itawamba County*, 431 F.3d 257, 259 (5th Cir. 2005):

> "The formulaic threshold is not an absolute determinant. Rather, it effectively allocates the burden of proof. Population deviation less than ten percent, for example, is not *per se* nondiscriminatory and is not an absolute bar to a claim of vote dilution. . . . With a deviation less than ten percent, a plaintiff must prove that the redistricting process was tainted by

- 46 -

> arbitrariness or discrimination.  That is, a deviation less than
> ten percent is not a safe harbor, barring any claim of
> discrimination . . . ."

*See also Fairley v. Hattiesburg*, 584 F.3d 660 (5th Cir. 2009); *Daly v. Hunt*, 93 F.3d 1212

(4th Cir. 1996); *Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022 (D.

Md. 1994).  The new question is whether *Larios* established the converse – that a

deviation of less than 10% is *not* a safe harbor against an equal population challenge.

   *Larios*, as noted, arose from a judgment entered by a U.S. District Court that the

2001 Legislative and Congressional districting plans adopted by the Georgia Legislature

violated the one person, one vote requirement of the Equal Protection Clause because:

> "Each deviates from population equality by 9.98% of the ideal
> district population and there are no legitimate, consistently
> applied state policies which justify these population deviations.
> Instead the plans arbitrarily and discriminatorily dilute and
> debase the weight of certain citizens' votes by intentionally
> and systematically underpopulating districts in rural south
> Georgia and inner-city Atlanta, correspondingly
> overpopulating the districts in suburban areas surrounding
> Atlanta, and by underpopulating the districts held by
> Democrats."

*Larios v. Cox, supra*, 300 F. Supp.2d 1320, 1322 (N.D. Ga. 2004).  Those conclusions

were supported by extensive and detailed findings.

   The District Court offered as the legal basis for its action the conclusion of the

Supreme Court in *Karcher v. Daggett*, 462 U.S. 725, 740-41, 103 S. Ct. 2653, 2663, 77 L.

Ed.2d 133, 147 (1983), a Congressional redistricting case, that deviations from exact

population equality may be allowed "to further legitimate state interests such as making

- 47 -

*49q*

districts compact and contiguous, and avoiding incumbent pairings." It found, however, that none of those interests were evident in the case before it and, citing *Roman v. Sinock*, 377 U.S. 695, 710, 84 S. Ct. 1449, 1458, 12 L. Ed.2d 620, 629-30 (1964), held that "where population deviations are not supported by such legitimate interests but, rather, are tainted by arbitrariness or discrimination, they cannot withstand constitutional scrutiny." *Larios, supra*, 300 F. Supp.2d at 1338.

The case reached the Supreme Court on direct appeal from the judgment of the three-judge panel. It was not set for argument, but was decided on a motion to affirm, a reply brief opposing the motion, and an *amicus* brief filed by the Democratic Legislative Campaign Committee. Although several subsidiary issues were raised in those papers, the predominant point of contention was whether the "10% rule" did, in fact, create a safe harbor for the State rather than act simply as a burden of proof mechanism. The State's opposition to the motion to affirm asserted that if a disparity of less than 10% was not a safe harbor, there would be, in effect, a zero percent tolerance, as the State would have to justify *any* deviation from mathematical equality. That argument was made as well in the *amicus* brief. Both briefs claimed that the District Court ruling was inconsistent with established Supreme Court precedent.

The motion to affirm pointed out that the Supreme Court consistently has avoided imposing fixed mathematical formulas as mandatory standards. Appellees argued that the District Court acted on evidence showing that an apportionment plan with far less

- 48 -

50 a

deviation – both maximum and average – could have been produced, that the excessive

deviations were unnecessary to achieve any legitimate goal, such as compactness,

contiguity, respect for county boundaries, or preservation of the core of existing districts,

and that ample unrebutted evidence showed that the plan deliberately was designed to

maintain Democratic control in the face of rising Republican support.

As noted, the judgment was affirmed without an Opinion of the Court. A

concurring opinion was filed by Justice Stevens, which Justice Breyer joined. Justice

Scalia filed a dissent. The judgment was announced in June 2004 – three months after the

Court decided *Vieth v. Jubelirer*, 541 U.S. 267, 124 S. Ct. 1769, 158 L. Ed.2d 546 (2004),

upon which both Justice Stevens and Justice Scalia commented.[20]  Justice Stevens noted:

---

[20] In *Davis v. Bandemer*, 478 U.S. 109, 106 S. Ct. 2797, 92 L. Ed.2d 85 (1986), a
Congressional redistricting case, the Court, by a six-to-three vote, held that political
gerrymandering was a justiciable issue, because there were discernible and manageable
standards by which such cases could be decided. Unfortunately, the six Justices in the
majority could not agree on what those standards might be. In a plurality Opinion, Justice
White offered one set. Justices Powell and Stevens offered another set. In the succeeding
18 years, most of the lower courts that dealt with the issue applied the standards offered
in Justice White's Opinion, but application of those standards produced the same result as
if the issue had been declared non-justiciable; judicial intervention was always refused.

In *Vieth*, also a Congressional redistricting case, the Court undertook to reconsider
*Davis*. There was no majority. Four Justices, in a plurality Opinion by Justice Scalia,
declared that no judicially discernible and manageable standards had emerged since *Davis*
and concluded that, in the absence of such standards, political gerrymandering claims
were non-justiciable and that *Davis* had been wrongly decided. They voted to affirm the
judgment of the District Court, which had denied relief. Justice Kennedy, concurring,
agreed that the District Court judgment should be affirmed, but he was not ready to
foreclose "all possibility of judicial relief if some limited and precise rationale were found
to correct an established violation of the Constitution in some redistricting cases." *Vieth*,
541 U.S. at 306, 124 S. Ct. at 1793, 158 L. Ed.2d at 576 (Kennedy, Concurring). In three

5/9

Case 1:15-cv-02417-ELH   Document 1-5   Filed 08/14/15   Page 50 of 73

"In challenging the District Court's judgment, appellant invites
us to weaken the one-person, one-vote standard by creating a
safe harbor for population deviations less than 10 percent,
within which districting decisions could be made for any
reason whatsoever. The Court properly rejects that invitation.
After our recent decision in [*Vieth*], the equal-population
principle remains the only clear limitation on improper
districting principles, and we must be careful not to dilute its
strength."

Justice Scalia regarded the case as presenting an issue not squarely confronted in

*Brown, Gaffney,* and *Voinovich* – "whether a districting plan that *satisfies* this 10%

criterion may nevertheless be invalidated on the basis of circumstantial evidence of

partisan political motivation." *Cox v. Larios,* 542 U.S. at 951, 124 S. Ct. at 2809, 159 L.

Ed.2d at 834 (Scalia, Dissenting). He acknowledged that the District Court opinion was

consistent with others that had addressed the issue but believed that the Supreme Court

should not summarily affirm unless it was clear that the decision was correct, and he was

not convinced that it was correct. Citing *Vieth,* Justice Scalia concluded that "politics as

usual" is a traditional and Constitutionally permissible criterion "so long as it does not go

too far" and he believed that the legislature does not go too far when it stays within the

10% disparity. *Id.* at 952, 124 S. Ct. at 2809, 159 L. Ed.2d at 834-35.

As noted, the State dismisses *Larios* as non-precedential – or really of any value –

separate Opinions, four Justices – Stevens, Souter, Ginsberg, and Breyer – dissented,
offering differing possible standards. The net effect seems to be that political
gerrymandering remains, in theory, a justiciable issue, but no clear standards exist for
adjudicating that issue, and, if history is a guide, no judicial relief on that ground is likely.
*See LULAC, supra,* 548 U.S. 399, 126 S. Ct. 2594, 165 L. Ed.2d 609).

- 50 -

52a

on the ground that a summary affirmance by the Supreme Court without an Opinion

affirms only the judgment and not any of the reasoning of the lower court. That is

ordinarily the case, as the Supreme Court itself has made clear. That does not mean,

however, that a summary affirmance of a lower court judgment has no precedential value.

Given that the judgment affirmed in *Larios* necessarily and expressly rested on the

conclusion that the "10% rule" was not a safe harbor that rendered the plan immune from

judicial inquiry on the ground that it was the product of legally impermissible

discrimination, which both the concurring and dissenting Justices recognized, the Supreme

Court's affirmance of that judgment at least had to reflect its agreement with that

proposition; otherwise, the judgment could not have been affirmed.[21]

---

[21] At the hearing before the Special Master, the State relied on a summary affirmance by the Supreme Court of a District Court judgment in another "10% rule" case, *Rodriguez v. Pataki*, 308 F. Supp.2d 346 (S.D.N.Y. 2004), *aff'd without Opinion*, 543 U.S. 997, 125 S. Ct. 627, 160 L. Ed.2d 454 (2004), as establishing that the "10% rule" *did* establish a safe harbor. The State misreads that case. Contrary to the State's view, the District Court held "We conclude, with *Marylanders [for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022] at 1032 [D. Md. 1994] that a plan within the 'ten percent rule' is not per se immune from judicial review. No decision explicitly adopts the per se rule." *Rodriguez*, 308 F. Supp.2d at 364. The court continued:

> "Moreover, in light of recent technological changes, there is reason not to allow the state systematically to dilute the votes of certain classes of citizens simply because the state is able to keep its discrimination within a ten-percent deviation. The powerful computer programs of today allow states to manipulate districting lines to alter voting patterns within a district with a high degree of precision. Under these circumstances, we see no reason to give a state operating within a ten-percent margin immunity from all review as to whether it is acting irrationally or undertaking invidious

53a

In this case, it is unnecessary to determine whether the summary affirmance in

*Larios* has precedential effect, for it is entirely consistent with earlier pronouncements of

the Supreme Court, which *have* been found precedential by both the lower Federal courts

and this Court, that the "10% rule" merely establishes a basis for assuming *prima facie*

---

> discrimination. The benefit of flexibility to pursue legitimate
> state policies that states receive under the 'ten percent rule'
> since Brown carries with it a responsibility not to use the rule
> to frustrate the very purpose of the dicennial census and
> systematically discriminate against a group of voters." *Id.* at
> 365.

The ultimate conclusion of the District Court was that the petitioners had not
proved that there *was* invidious discrimination by the State, and, for *that* reason, it found
no equal protection violation and dismissed the complaint.   It was that judgment that was
summarily affirmed by the Supreme Court.

In its post-hearing memorandum, the State paid scant attention to *Rodriguez* but
offered another summary affirmance case, *Fund for Accurate and Informed
Representation, INC. (FAIR) v. Weprin,* 796 F. Supp. 662 (N.D.N.Y. 1992), *summarily
aff'd,* 506 U.S. 1017113 S. Ct. 650, 121 L. Ed.2d 577(1992) as establishing that the
petitioner's concession that the maximum deviation in the challenged plan was less than
10% "is fatal to the one person, one vote claims because, absent credible evidence that the
maximum deviation exceeds 10 percent, plaintiffs fail to establish a *prima facie* case of
discrimination under that principle sufficient to warrant further analysis by this Court."

The District Court did make that statement as part of its *per curiam* rejection of a
multi-faceted attack on the 1982 and 1992 State legislative redistricting plans crafted by
the New York Legislature, but it hardly establishes a Supreme Court precedent for the
proposition that a plan containing a maximum deviation of less than 10% renders the plan
immune from attack based on impermissible gerrymandering.  For one thing, the Supreme
Court may have affirmed because it found insufficient evidence in the record of any such
gerrymandering. As the State points out, a summary affirmance does not constitute an
affirmance of the lower court's reasoning, at least where acceptance of that reasoning is
not essential to the affirmance, which in *FAIR,* it was not. For another, *FAIR* was decided
in 1992. *Larios* and *Rodriguez* were decided in 2004.  If there *is* any inconsistency
between *FAIR,* on the one hand, and *Larios* and *Rodriguez,* on the other, which is not at
all clear, the latter must prevail.

54a

validity or invalidity and thus acts, as petitioners contend, as a burden of proof mechanism with respect to the one person, one vote equal protection issue. The case law seems to be that the State does not have to explain a maximum deviation under 10% unless the challenger presents sufficient evidence to indicate that significant population deviations were deliberately created in furtherance of intentional impermissible racial, political, or regional discrimination, but that, if such evidence *is* produced, the plan is not immune from judicial inquiry.

Petitioners contend that the Enacted Plan is the product of impermissible discrimination based on population density, region, partisanship, and race. They rely on evidence and conclusions from their expert, M. V. Hood III, a political science associate professor at the University of Georgia. To determine whether that evidence is sufficient to overcome the presumption of validity, it needs to be examined.

## Population Density and Regional Discrimination

With respect to population density, Professor Hood divided the population of each of the 47 Senate Districts and the Delegate Subdistricts under the Enacted Plan by the size of the district measured in square miles. From that, he concluded that the districts with the highest population density – the urban districts – are underpopulated (contain fewer people than the "ideal" number) and that those with the lower population densities – the rural districts – are overpopulated (contain more people than the "ideal" number). *See*

- 53 -

55a

Hood Declaration (July 13, 2012), ¶¶ 5 and 6 and Figures 1 and 2.[22]

Although Professor Hood's charts on this point do not identify the various districts – which ones have a high, medium, or low density – his ultimate conclusion, that "a pattern exists whereby the State's legislative plan under populates urban districts while overpopulating rural districts" indicates that the disparity is between rural and urban districts, and he does set forth a methodology for determining that.

Professor Hood grouped the Delegate Districts into four geographic areas of the State – the Western region, comprising Garrett, Allegany, Washington, Frederick, and Carroll Counties, containing five Senate Districts with 15 Delegate seats; the Southern Region, comprising Calvert, Charles, and St. Mary's Counties containing three Senate Districts with nine Delegate seats; Baltimore City, containing five Senate Districts and one Delegate Subdistrict with 16 Delegate seats; and a conglomerate of the Eastern Shore, Harford County, and part of Baltimore County, containing six Senate Districts with 18 Delegate seats.[23] The districts in the Western region, in the aggregate, are one percent

_____

[22] Professor Hood found that, among the 25 Legislative Districts with the lowest population density (less than 2,000 people per square mile), 17 (68%) had positive deviations. In contrast, the three districts with the highest population density (more than 8,000 people per square mile) were underpopulated by nearly 5% and, of the 12 districts with a population density of 4,000 or more persons/square mile, eight (67%) were underpopulated. Similar conclusions were reached for the Delegate subdistricts.

[23] This grouping accounts for only 58 of the 141 Delegate seats. Missing is the bulk of the State's population – Montgomery, Prince George's, Howard, and Anne Arundel Counties, and a large part of Baltimore County, from which 83 Delegates are elected.

56a

over the "ideal." Those in the Southern region are more than four percent over the "ideal,"

and those in the conglomerate region are more than three percent over the "ideal." The

Baltimore City districts are 4.3% under the "ideal." From this, Professor Hood opines that

"legislative districts housed within certain regions of Maryland are intentionally over or

under populated." Hood Declaration, ¶¶ 10 - 12 and Table 1.

The State's response is three-fold. It notes that the deviation patterns in the

Enacted Plan generally follow those of the Court-devised plan in 2002. It points out also

that the petitioners have presented no evidence of the type presented in *Larios*, of a

systematic, intentional manipulation of district populations without a legitimate State

purpose. Professor Cain concluded that petitioners' methodology was "misleadingly

simplistic" in that it failed to account for the fact that there were urban areas in many of

the counties that Hood regarded as rural. Cain noted, for example, that, according to the

Department of Planning, Charles County had an urban population of 70.4%, Wicomico

County had an urban population of 74.2%, and there were only three counties – Garrett,

Kent, and Caroline – where the percentage of urban population was less than 40%. Cain

Declaration, June 5 2012, ¶ 4.

Professor Cain suggests that a close examination of the population deviations

shows that the primary variation is between minority areas protected by the Voting Rights

Act and those that are not, rather than between rural and urban populations. He points out

that there is an average difference in population of nearly 6,000 voters between majority

- 55 -

57a

and concluded that "[o]nce the majority minority districts are accounted for, there is no partisan pattern in the population deviations of the districts in the Enacted Plan." Cain Declaration, June 5, 2012, ¶ 7 and Figures 1 and 2. Professor Hood, in response, calculated how people in only the majority white districts voted for President and Governor in the 2008 and 2010 general elections and concluded that "[e]ven without the presence of majority-black Senate districts there still remains a moderately strong, negative relationship between district population deviation and district partisanship." Hood Declaration, ¶ 15 and Figures 3.2 and 4.2.

The difference between the two experts seems to be that one (Hood) has used voting patterns for President and Governor in the 2008 and 2010 general elections and the other (Cain) has used voter registration to indicate partisanship. The Special Master suggests that voter registration is the more reliable indicator of partisanship than votes for President and Governor in two general elections. The latter takes no account of how people voted in the Congressional races or in the contests for State legislative or judicial offices or county or municipal legislative or executive offices in those elections; nor does it account for the various reasons why members of one party may have voted for the Presidential or Gubernatorial nominee of the other in those particular elections. Apart from that, the petitioners presented none of the kind of evidence presented in *Larios* that might directly show an intent on the part of the Governor or the General Assembly to underpopulate or overpopulate districts for solely partisan purposes. **In light of *Vieth v.**

- 57 -

59a

*Jubelirer, supra*, 541 U.S. 267, 124 S. Ct. 1769, 158 L. Ed.2d 546 and *LULAC, supra*, 548 U.S. 399, 126 S. Ct. 2594, 165 L. Ed.2d 609, the petitioners have not presented a sufficient case of impermissible political gerrymandering to warrant judicial relief on that ground.

Discrimination Based On Race – Equal Protection

With regard to race, Professor Hood charted, for both the 47 Senate Districts and the Delegate Subdistricts, the non-Hispanic African-American VAP against district population deviation, from which he concluded that there was a negative association between population deviation and district racial composition – *i.e.*, that black districts were underpopulated. Hood Declaration, ¶ 16 and Figures 5 and 6. He noted that "[e]very majority-black Senate district is at least 4% under populated and all but one of these is more than 4% below the ideal population." *Id*, ¶ 16. A more detailed analysis and the conclusions he reached were reserved for the Voting Rights Act claim, dealt with in the next section of this Report. Except possibly by tacit inference, he expressed no opinion regarding whether the disparities or associations constituted a violation of the one person, one vote requirement under the Equal Protection Clause.

In his two Declarations, Professor Cain offered four responses, or explanations, for the underpopulating of majority African-American districts. First, he suggested, without any statistical support, that the population differences were "quite small" in terms of

60a

"likely voters" – a term he did not define – especially in the single and double-member Delegate Subdistricts, and were unlikely to affect electoral efforts. Second, relying in part on a memorandum from the Census Bureau, which was not attached and is not in the record, he proffered that "given the history of past census efforts, there was ample reason to suspect that the racial and ethnic minority areas would be under-counted and justification for compensating for this with the population variances." Third, he noted that the pattern of underpopulated minority districts was evident in the Court's 2002 plan as well. Finally, he posited that the underpopulation was justifiable because racial minority populations Statewide are projected to grow faster than the State's white population. Cain Declaration, June 5, 2012, ¶ 6.[24] *See also* Cain Declaration, July 13, 2012, ¶¶ 2 through 17. Petitioners, in rebuttal, note that general allegations of census undercounts have been rejected as an excuse for underpopulating districts.

As noted earlier, there are three sources of Federal prohibition against impermissible racial discrimination in legislative districting – the Fifteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and § 2 of the Voting Rights Act – and there is some overlap among them. No claim has been made under the Fifteenth Amendment, and the Voting Rights Act is considered *infra*. The best analysis of the

---

[24] There is an apparent typographical error in Professor Cain's statement. He actually said that allowing lower population in heavily concentrated racial minority areas was justifiable "given that racial minority populations are projected to grow faster than Maryland's *non-white* population." (Emphasis added). Presumably, he meant Maryland's *white* population. His next sentence makes that clear.

6 / 9

protection afforded by the Equal Protection Clause is in *Shaw v. Reno, supra*, 509 U.S. 630, 113 S. Ct. 2816, 125 L. Ed.2d 511. The Court there confirmed, citing *Washington v. Davis*, 426 U.S. 229, 239, 96 S. Ct. 2040, 2047, 48 L. Ed. 2d 597, 607 (1976), that the "central purpose [of that Clause] is to prevent the States from *purposely* discriminating between individuals on the basis of race." *Shaw*, 509 U.S. at 642, 113 S. Ct. at 2824, 125 L. Ed.2d at 525 (Emphasis added).

The Court observed that no inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute or where statutes, although facially race neutral, on their face are unexplainable on grounds other than race. In some exceptional cases, the Court noted, a reapportionment plan may be "so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to 'segregate . . . voters' on the basis of race," citing and giving as an example *Gomillion v. Lightfoot*, 346 U.S. 339, 81 S. Ct. 125, 5 L. Ed.2d 110 (1960). The Court then gave some other examples of that kind of impermissible discrimination. Its ultimate conclusion, relevant here, was:

> "[A] plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification."

*Shaw*, 509 U.S. at 649, 113 S. Ct. at 2828, 125 L. Ed.2d at 530.

Unlike a claim under the Voting Rights Act, a challenge under the Equal Protection

- 60 -

*62a*

Clause requires a showing of intentional discrimination, either directly or by necessary implication. Petitioners have the burden of making that showing, and they have failed to do so. All they have established is that majority African-American districts are underpopulated, though not by as much as five percent, that most white majority districts are not, and that a plan could be devised with lower population disparities. They have not shown either that the disparities in the Enacted Plan intentionally were designed to segregate the races or that they cannot be explained on any other basis.

Apart from the lack of evidence supporting a claim of purposeful racial discrimination, there is substantial evidence supporting the converse. It lies in the Enacted Plan itself but is summarized in the Governor's December 16, 2011 press release (**State's Exhibit 1**), which, commenting on the GRAC Plan, notes:

> "The GRAC map has 12 districts that are majority African American – an increase from the 10 districts that the Court of Appeals drew in 2002. This reflects the growth in African American population in the State, and provides a much stronger voice for the African American community. These districts are 10, 22, 23, 24, 25, 26, 40, 41, 43, 44, 45, 47. In addition to the 12 majority African American districts, the map das 4 districts (20, 21, 28, 39) that are majority minority. For the first time in Maryland's history, GRAC recommends the creation of a single-member Hispanic district in Prince George's County, District 47B, which is over 63% Hispanic."

**For the reasons noted, it is recommended that challenge based on the Equal Protection Clause be found without merit.**

63a

## Voting Rights Act

_____The text of § 2 of the Voting Rights Act is quoted *supra*, at page 9. Two types of claims seem to predominate challenges under that section -- (1) that a protected population that is sufficiently large and compact to be able to elect their preferred candidate from a single-member district is spread among two or more districts where they can be outvoted in each and thus unable to elect their preferred candidate , or (2) that a significant part of a protected population that, on the whole, is sufficiently large and compact to have at least a fair chance of electing their preferred candidates in more than one district is compacted into one district, thereby lessening the opportunity of that population to elect their preferred candidate in the other district.

Commencing with *Thornburg v. Gingles, supra*, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed.2d 25 (*Gingles*) and extending through *LULAC, supra*, 548 U.S. 399, 126 S. Ct. 2594, 165 L. Ed.2d 609 and *Bartlett v. Strickland, supra*, 556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed.2d 173, the Supreme Court has created a framework for dealing with challenges to a districting plan under § 2. In order to establish a § 2 violation, the claimant must first satisfy three threshold conditions. As initially set forth in *Gingles* (and thus often referred to as the "*Gingles* factors"), they are:

(1) "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multimember form* of the

6 4 9

district cannot be responsible for minority voters' inability to elect its candidates."

(2) "Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests."

(3) "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority candidate running unopposed . . . usually to defeat the minority's preferred candidate. . . . In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representative." *Gingles*, 478 U.S. at 50-51, 106 S. Ct. at 2766-67, 92 L. Ed.2d at 46-47; *LULAC*, 548 U.S. at 425, 126 S. Ct. at 2614, 165 L. Ed.2d at 635-36.

If all three threshold factors are satisfied, the Court must consider the "totality of the circumstances" to determine whether members of a racial group have less opportunity to elect representatives of their choice than do other members of the electorate. The factors relevant to a totality of the circumstances analysis include:

(1) The history of voting-related discrimination in the State or political subdivision;

(2) The extent to which voting in State or subdivision elections is racially polarized;

(3) The extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group;

65a

(4) The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(5) The use of overt or subtle racial appeals in political campaigns;

(6) The extent to which members of the minority group have been elected to public office in the jurisdiction; and

(7) Whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area.[25]

The allegations in the petition that may be relevant to either the three threshold factors or the factors to be considered in a "totality of the circumstances" analysis are both general and conclusory. Petitioners aver that:

(1) Districts with African-American majorities are underpopulated (¶ 64);

(2) Maryland "discriminated against African-Americans by using multi-member districts to dilute African Americans ability to elect candidates of their choice" (§ 70);

(3) African Americans can constitute a compact minority group in a significantly larger number of districts than under the current map" (§ 71);

---

[25] These factors are taken from *LULAC, supra*, 548 U.S. at 426, 126 S. Ct. at 2614, 165 L. Ed.2d at 636. In the 1993 redistricting case, this Court quoted the factors as expressed in *Gingles*, which are essentially the same. *Legislative Redistricting Cases, supra*, 331 Md. at 605, 629 A.2d at 661. *LULAC* is a later Supreme Court case.

(4) "Given African American population in Maryland, there should be more African American representatives in the Maryland General Assembly" (¶ 72);

(5) "Maryland has a history of racially polarized voting," citing Democratic primary election races in 2006 for a U.S. Senate seat and for State Attorney General – both Statewide offices – in which a white candidate defeated a black candidate (¶ 73); and

(6) "Maryland history or race relations and socioeconomic history," combined with the record of minority success in elections demonstrates that the totality of the circumstances test has been met" (¶ 74).

The evidence offered in support of those allegations appears in the Hood Declaration. Professor Hood notes that, according to the 2010 census, non-Hispanic blacks comprised 28% of the Statewide VAP but 60.3% of the VAP in Baltimore City and 62.6% of the VAP in Prince George's County. Hood Declaration ¶ 21. Using an "ecological inference estimate," Hood concluded that, in the vote for Governor in the 2010 general election, the white vote split 35.6% for the Democratic candidate and 61.8% for the Republican, whereas 98.4% of the black vote went for the Democrat and only 0.4% for the Republican. Table 2. Based on that estimate, he proclaims that "[t]here is a great deal of racial polarization between black and white voters in Maryland with black support going overwhelmingly for Democratic candidates and a majority of the white vote cast for

67a

the Republican candidate" (¶ 22).[26]

Professor Hood further supports that conclusion with "ecological inference estimates" from three races for State Senate seats in the 2002 Democratic primary (Legislative Districts 23, 27, and 41), two races for legislative seats in the 2006 Democratic primary (one for Senate in District 23 and one for three Delegates in District 28), one for a Senate seat in the 2010 Democratic primary (District 23), and the races for U.S. Senate and Attorney General in the 2010 Democratic primary.[27]  Based on his "ecological inference estimates," he infers that, in four of the six local races, the candidate receiving the largest share of the black vote lost, from which he concludes that "[legislative districts then that do not contain a sufficient number of black voters can see the preferred choice of the black community defeated by a polarized bloc of Anglo

---

[26] Professor Hood defines or characterizes an "ecological inference estimate" as a statistical technique that "allows researchers to make inferences about individual-level behavior which is not directly observable, from observable aggregate-level measures." He gives as an example, "if one has precinct-level measurements for the percentage of black and white registrants and the percentage of the vote cast for Obama and McCain, it would be possible using EI to estimate the percentage of black registrants who voted for Obama versus McCain and the percentage of white registrants who voted for Obama and McCain." Professor Hood cites two reference works regarding ecological inference estimates but presents no data regarding the acceptability of this technique among either statisticians or political scientists and merely assumes its reliability. It appears to estimate racial *voting* in a particular election based on racial *registration*. Hood Declaration at 13, n.11.

[27] Senate Districts 23 and 27 are in Prince George's County; Senate District 28 is in Charles County; and Senate District 41 is in Baltimore City.

68a

voters."[28]  ¶ 35.

The analysis of a complaint under § 2 must begin with the three threshold factors

stated in *Gingles*. Those factors, from their very text, focus on individual districts –

whether the minority group is sufficiently large to constitute a majority in a single-member

district, whether the minority population in that district is politically cohesive, and whether

the white population votes sufficiently as a block to enable it to defeat the minority's

---

[28] The raw data offered by Professor Hood is of interest. In the first example – the
2002 Democratic primary for a Senate seat in Senate District 41 in Baltimore City – the
district was 69.7% black and the black candidate defeated the white candidate. ¶ 25 and
Table 3. Unmentioned is the fact that the black candidate had represented the African-
American area of the district as a Delegate for many years and was well known in the
community, whereas the white candidate had recently been placed in the African-
American area through the Court's 2002 redistricting plan, although she had represented
the white area as an incumbent Senator. In the second example, in Senate District 27,
which had only a 38.1% black VAP, the white candidate won in a race against two black
candidates. The white candidate got 84.6% of the white vote but also got 47.8% of the
black vote, more than one of the black candidates. ¶ 26 and Table 4. Although that
district, which encompassed Calvert County and part of Prince George's County, was
split into two Delegate Subdistricts, the race at issue was for the Senate seat, which was
necessarily district-wide. In the third example, where the district (Prince George's
County Senate District 23) had only a 43.5% black VAP, the white candidate also won.
¶ 27 and Table 5. As in the second example, that district was split into two Delegate
Subdistricts, but the race at issue was a district-wide one for a Senate seat. In the fourth
example, the district had a 61% black VAP and, in a Senate race against two black
candidates who split the black vote, the white candidate won. ¶ 28 and Table 6. In the
fifth example, in Senate District 23 that had a 61% black VAP, the white candidate won
in a race against three black candidates, receiving 44% of the black vote – more than any
of the black candidates. ¶¶ 29, 30 and Table 7. In the sixth example, in Legislative
District 28, a three-delegate district that had a 39.1% black VAP in which three white
candidates and one black candidate were running, the three white candidates won,
receiving among them 67.1% of the black vote, the black candidate receiving only 32.9%.
¶ 31 and Table 8.1.

preferred candidate. Only if those factors, so focused, are met does the Court look at broader factors, that may be Statewide or regional in nature, as part of the totality of the circumstances.

As noted, the only districts for which any evidence was presented were Legislative Districts 23, 27, 28, and 41. No evidence was presented to show that any other district or subdistrict was similarly situated. Although, as part of their prayers for relief, petitioners ask for a declaratory judgment that the Enacted Plan, in its entirely, be found in violation of § 2, they have not indicated how the alleged violation, with respect to any particular district, should be corrected. They have asked the Court to adopt the Hough/Alston Plan, which they claim would reduce population disparities but have not alleged how that Plan (or the Coherent County Plan) would resolve the alleged Voting Rights Act violations by creating new or different single-member (or multi-member) Delegate Districts.

The State acknowledges that it would have been possible to devise a plan that created more single-member majority African-American districts, but contends that, absent proof that the Enacted Plan violates the Voting Rights Act, it was not required to do so, and, that, in determining whether there is such a violation (1) there is no requirement that African-Americans (or any other group) have representation in the General Assembly in proportion to their share of the population, and (2) because the threshold *Gingles* factors focus on individual districts, Statewide voting patterns are not determinative with respect to those factors but are relevant only to an examination of the totality of circumstances

once the petitioners satisfy those threshold factors. The State is correct in those regards.

Except for the last two examples given by Professor Hood, in which a significant part of the estimated black vote went for the white candidate(s), the data he presented, assuming the validity of the "ecological inference estimate" approach, does provide evidence of racially polarized voting in one Legislative District in Baltimore City and three Legislative Districts in Prince George's County. All but one of the examples, however, (District 23) involved district-wide Senate races in which the issue of using multi-member districts to dilute the African-American vote is not raised.

Professor Cain criticizes Hood's analysis on a number of grounds. He contends that it is incomplete and skewed, noting that "[h]ad he taken a broader sample, he would have discovered that Maryland's recent record of white voting polarization is much more mixed and varies with the specific candidates running for office." Cain Declaration July 13, 2012, ¶ 14. He points out first that in the 2008 Democratic Presidential primary election, Obama received 39.6% of the non-Hispanic white vote, and in the 2006 Democratic primary race for Attorney General, the black candidate received 36% of the non-Hispanic white vote. *Id.*

Supporting his point regarding the variance by candidate, Professor Cain notes that, in Montgomery County, in the 2006 Democratic primary, the black candidate for County Executive (Leggett) received 65% of the non-Hispanic white vote, that the black candidate for Attorney General (Simms) received only 25% of the white vote, and that the black

candidate for U.S. Senate (Mfume) received only 13% of the non-Hispanic white vote. *Id.* ¶ 16. With respect to the race for Attorney General, the black candidate (Simms) was from Baltimore City and the white candidate (Gansler) was the incumbent State's Attorney for Montgomery County. Cain notes that Simms received 49.7% of the non-Hispanic white vote in Baltimore City and Baltimore County, where he was better known. Professor Cain concludes, "Given this mixed record, it was prudent of the state not to dismantle the majority African-American VAP seats at this time." *Id.* ¶ 17.

The State's ultimate point is that "the mere allegation that it is possible to draw a plan that meets all redistricting requirements and has more African American districts than the Enacted Plan . . . does not establish a violation of the Voting Rights Act . . .", that to establish such a violation, petitioners must show not only that more minority districts could be created "but that the additional districts will satisfy the [*Gingles*] factors," and that they have failed to do so. **The Special Master concurs in that judgment and finds no merit to the Voting Rights Act claim.**

### Due Regard; Compactness

The Houser petition is extremely skimpy regarding alleged violations of Article III, § 4 of the Maryland Constitution. In ¶¶ 92 through 95, petitioners merely state that the Enacted Plan contains 17 Senate districts and 32 Delegate districts that are split between county lines for reasons unrelated to compliance with Federal law or the Maryland

72q

Constitution, that the plan is not compact in form, that alternative plans are available that contain fewer shared districts and that are more compact in form, and that, as a result, the Enacted Plan violates the "due regard" requirements.

Those allegations are supported by equally general statements by petitioners' expert, Thomas B. Hofeller, who has had extensive experience in working with redistricting issues. Dr. Hofeller also filed two Declarations, one dated June 19, 2012 and the other dated July 13, 2012. In the latter Declaration, he compared the Enacted Plan, with respect to both Senate and Delegate Districts, to the Hough/Alston Plan and the Coherent County Plan in terms of "necessary" and "unnecessary" county crossings (which he refers to as "fragments"). He defines a "necessary fragment" as "one that includes a whole county, is necessary for adhering to the one person, one vote rule, or compliance with the Voting Rights Act." *See* Hofeller Declaration, July 13, 2012, Table 1, n. 2. Presumably, all other "fragments" are regarded as unnecessary ones. In Table 1, he shows the following:

Enacted Plan

    Senate Districts:
        Necessary fragments: 27
        Unnecessary fragments: 6
    House Districts:
        Necessary fragments: 19
        Unnecessary fragments: 17

Coherent Counties Plan:

    Senate Districts:
        Necessary Fragments: 27

- 71 -

73a

> Unnecessary fragments: 0
> House Districts:
> > Necessary fragments: 20
> > Unnecessary fragments: 2

Hough/Alston Plan:

> Senate Districts:
> > Necessary fragments: 26
> > Unnecessary fragments: 13

> House Districts:
> > Necessary fragments: 19
> > Unnecessary fragments: 12

Dr. Hofeller does not indicate, with respect to any of the fragments he regards either as necessary or unnecessary, why, in particular, he placed them in that category. Nor do petitioners in their other submissions. From just this unexplained assortment, Dr. Hofeller concludes that "the Governor's Plan did a poor job in paying 'due regard' to county boundaries and that the plan's non-conformance could not be justified by any other constitutionally-mandated factor" and he touts the two alternative plans – the Coherent County Plan and the Hough/Alston Plan – as much better with respect to population deviations and county crossings.

The State acknowledges that both of those plans are better than the Enacted Plan in some respects but argues (1) that the fact that a better plan on those factors could be created is of little relevance to whether the Enacted Plan is Constitutional, and (2) that, in any event, those plans have simply elevated one or both of those factors over others that are at least equally important. The State points out, for example, that the Coherent County

Plan, which was never submitted to the General Assembly for consideration, though having fewer county crossings, has many more municipal boundary crossings, that it fails to preserve the core of existing districts, and that it pairs dozens of incumbent Delegates and a dozen incumbent Senators, many of whom are African-American. Similarly, the State notes that the Hough/Alston plan, though better on population deviations, is much worse than the Enacted Plan on compactness and in preserving the core of existing districts. Like the Coherent County Plan, it also pairs many incumbents – 56 Delegates and 12 Senators – and puts 19 African-American incumbent legislators at risk.

The law governing the meaning and application of the "due regard" provision in Article III, § 4 is set forth in the discussion of the Kelley/Brochin petition (Misc. No. 3) and need not be repeated. Although, upon a proper challenge supported by compelling evidence, the State has the burden of showing that due regard was given to county boundaries, the evidence necessary to support a proper challenge requires a great deal more than is presented here. Dr. Hofeller does not identify, with any particularity, *which* fragments he considers necessary or unnecessary. In Table 1, with respect to Senate Districts, he shows two fragments involving Baltimore County in the Enacted Plan as necessary and one as unnecessary but does not indicate which ones fall into which category. That is true as well with Carroll County. With respect to Delegate Districts, that same uncertainty is evident in Calvert, Cecil, Caroline, and Worcester (misspelled as Worchester) Counties.

For the reasons stated, the petition in Misc. No. 5 should be denied.

Respectfully submitted,

*Alan M. Wilner*

Alan M. Wilner
Special Master

76a